COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Decker, Judges Beales, Huff, O'Brien, AtLee, Malveaux, Athey, Fulton,
          Ortiz, Causey, Friedman, Chaney, Raphael, Lorish, Callins, White and Frucci
Argued at Richmond, Virginia


MAZIE GREEN
                                                            OPINION BY
v.      Record No. 0144-22-3            JUDGE MARY BENNETT MALVEAUX
                                                       DECEMBER 17, 2024
PORTFOLIO RECOVERY ASSOCIATES, LLC


                    UPON A REHEARING EN BANC

            FROM THE CIRCUIT COURT OF ALLEGHANY COUNTY
                           Edward K. Stein, Judge


            Matthew G. Rosendahl (Kristi C. Kelly; Kelly Guzzo, PLC, on
            briefs), for appellant.

            Monica Taylor Monday (L. Steven Emmert; James K. Trefil;
            Jonathan P. Floyd; Sykes, Bourdon, Ahern & Levy, PC; Troutman
            Pepper Hamilton Sanders LLP, on brief), for appellee.

            Amici Curiae: Legal Services of Northern Virginia, Virginia
            Poverty Law Center, Legal Aid Society of Eastern Virginia, Legal
            Aid Justice Center, Legal Aid Works, Central Virginia Legal Aid,
            Virginia Legal Aid Society, Legal Aid Society of Roanoke Valley,
            Virginia Trial Lawyers Association, and Blue Ridge Legal Services
            (Thomas Domonoske; Drew D. Sarrett; Brandon L. Ballard;
            Consumer Litigation Associates, P.C.; Legal Aid Society of Eastern
            Virginia, on brief), for appellant.

            Amicus Curiae: Virginia Creditors' Bar Association (John P.
            O'Herron; Ronald S. Canter; *Thompson*McMullan, P.C.; The Law
            Offices of Ronald S. Canter, LLC, on brief), for appellee.


        Portfolio Recovery Associates, LLC ("PRA") filed a warrant in debt against Mazie

Green.  The circuit court found that PRA was entitled to recover from Green and entered a

judgment order in PRA's favor.  Green appealed to this Court, arguing in part that the circuit

court erred "because PRA lacked standing to sue" and "because her counterclaim was never

heard." The majority of a three-judge panel reversed and vacated the circuit court's judgment and remanded for the court to consider Green's claim. *Green v. Portfolio Recovery Assocs., LLC*, 80 Va. App. 119, *mandate stayed upon grant of reh'g en banc*, 80 Va. App. 472 (2024). Upon PRA's petition for a rehearing en banc, we affirm the circuit court's judgment, except for the court's ruling on Green's claim which we reverse based on lack of subject matter jurisdiction.

## I. BACKGROUND[1]

Because "[t]he details of the evidence adduced at trial are not pertinent to the dispositive issue[s] before us"—standing and the hearing of Green's claim against PRA—"we will recite only those facts relevant to th[ose] issue[s]." *Roberts v. CSX Transp., Inc.*, 279 Va. 111, 114-15 (2010). We recite the relevant facts in the light most favorable to PRA, because "[t]he party who successfully persuades the factfinder 'is entitled [on appeal] to have the evidence viewed in the light most favorable to [them], with all conflicts and inferences resolved in [their] favor.'" *McCants v. CD & PB Enters., LLC*, 303 Va. 19, 22 (2024) (second alteration in original) (quoting *Chacey v. Garvey*, 291 Va. 1, 8 (2015)). "Viewing the facts through this evidentiary prism, we retell the story of this conflict." *Id.*

In December 2020, PRA filed a warrant in debt against Green in the general district court ("GDC"). In its bill of particulars, PRA alleged Green had defaulted on a CIT Bank credit account labeled "Paypal," with an account number ending in 7068, and asserted PRA was the "successor-in-interest to CIT Bank." PRA's bill of particulars was supported by a number of documents, including:

> (a) a September 1, 2010 bill of sale for unspecified "[a]ccounts," between CIT Bank and WebBank, as seller and buyer, respectively;

---

[1] Pursuant to Rule 5A:8(c), Green submitted a written statement of facts in lieu of a transcript of the proceedings in the circuit court. Where a statement of facts that satisfies Rule 5A:8(c)'s procedural requirements is filed in lieu of a transcript, there is a "presumption that [it] is binding upon this Court as an accurate recitation of the incidents at trial." *Smith v. Commonwealth*, 59 Va. App. 710, 722 (2012).

(b) an August 29, 2013 bill of sale for unspecified "[a]ccounts," between WebBank as seller and Comenity Capital Bank as buyer;

(c) a bill of sale and assumption agreement for unspecified "[a]ssets," dated July 2, 2018, between Comenity Capital Bank and Synchrony Bank, as seller and purchaser, respectively;

(d) a June 27, 2019 bill of sale for unspecified "[a]ccounts," between Synchrony Bank, "formerly known . . . as GE Capital Retail Bank," as seller, and PRA, as buyer;

(e) a July 2, 2019 affidavit of sale of account by original creditor, signed by Synchrony Bank's "Media Representative," attesting to Synchrony's June 27, 2019 sale to PRA of "charge-off accounts," and stating that electronic and other business records associated with those accounts had been "transferred on individual [a]ccounts" to PRA;

(f) a "data sheet" pertaining to a "former GE account number," listing Green's name, address, and birth year, an account number ending in 7068 with a 2010 "contract date" and a "current balance" of "891431";

(g) an August 6, 2020 declaration by PRA's custodian of records attesting that, "based upon a review of the business records of . . . CIT Bank/PayPal and those records transferred [to PRA] from Synchrony Bank," PRA now owned Green's account "ending in 7068" and was owed "the sum of $8,914.31";

(h) monthly PayPal Credit billing statements, from July 2017 through September 2018, bearing Green's name and address and reflecting an account number ending in 8616;

(i) a February 14, 2020 collection letter from PRA's attorneys to Green, listing CIT Bank as the "[o]riginal [c]reditor" of an "[o]riginal [a]ccount [n]umber" ending in 7068, and stating that "the amount owed on the [a]ccount is $8,914.31."

Acting *pro se*, Green disputed the debt, filing a grounds of defense challenging PRA's chain of title and arguing that PRA "has lack of standing." She also "allege[d] a [c]ounterclaim that [PRA] violated . . . the Fair Debt Collection Practices Act" ("FDCPA"). *See* 15 U.S.C. § 1692-1692p.

Three days before the case was scheduled for trial, the GDC contacted Green "and told [her] that she had to file a [warrant in debt] for her [c]ounterclaim to be heard." The record contains a copy of Green's warrant in debt against PRA, which indicates Green was "[f]iling lawsuit in violation [of the] Fair Debt Collections Practice Act [sic]."

The parties appeared for trial on PRA's warrant in debt on September 13, 2021. The GDC ruled in PRA's favor, and awarded PRA a judgment in the amount of $8,914.31 plus $63.00 in fees.

Green's FDCPA claim in her action against PRA was "dismissed without being heard" by the GDC.

Green filed a motion for a new trial in PRA's claim. The GDC denied the motion, and Green noted her appeal to the circuit court.

Acting *pro se* in the circuit court, Green filed a motion to amend her grounds of defense in which she repeated her allegation that PRA "has lack of standing." Further, she argued that her FDCPA claim against PRA had been dismissed by the GDC "without being heard."[2]

Green also filed a motion for summary judgment, alleging that PRA "has/had no standing to sue." She noted that although PRA claimed to be the assignee of the original creditor, the "original account ending number was 7068, but [PRA] provided the [c]ourt with a Pay[P]al Credit statement account number ending in 8616." Accordingly, Green argued, since PRA had not provided a "valid proof of assignment," "proof that the original account number ending in 7068 changed to account number ending in 8616," and a "contract for [the] C[IT] Bank account ending in 7068," it lacked standing to sue. The circuit court heard argument on the motion on November 17, 2021, and found that Green was "not entitled to [j]udgment in this matter."

---

[2] The record does not include a ruling on Green's motion to amend.

Immediately following the hearing, the circuit court conducted a trial on the merits. In a January 3, 2022 order, the circuit court memorialized its ruling on summary judgment from the pre-trial hearing, stated that Green's "counterclaim fails and she is not entitled to judgment on same," and held that PRA was entitled to recover $8,914.31 against Green plus costs of $63.00.

Green appealed, *pro se*, to this Court, arguing among other things that:

> The trial court erred as a matter of law by finding that PRA was entitled to judgment against Ms. Green. That finding was error because PRA lacked standing to sue and this violated due process.
>
> The trial court erred as a matter of law by finding that Ms. Green's FDCPA counterclaim failed because her counterclaim was never heard violating due process.[3]

With one judge dissenting, a panel of this Court held that "the assignment of rights alleged here created a standing issue," and then considered PRA's evidence in the circuit court—including evidence only adduced at trial—and concluded PRA had failed to "prove that [it] owns Green's debt through a chain of title tracing back to CIT Bank." *Green*, 80 Va. App. at 136, 146. The majority then further held that "because PRA failed to establish its ownership of a debt owed by Green," it "had no legally cognizable interest in the alleged controversy"—i.e., no standing to sue. *Id.* at 136-37. Based on this holding, the majority held that the circuit court abused its discretion "by finding the debt was valid and dismissing Green's counterclaim." *Id.* at 149. The majority reversed and vacated the circuit court's judgment and mandated that on remand, the circuit court "enter final judgment that Green does not owe a debt to PRA and . . . further consider [her] counterclaim." *Id.* at 150-51.

The dissenting judge concluded that under Virginia law, "[w]hether PRA owned Green's debt was a matter for the circuit court to consider on the merits and did not create a standing

---

[3] Green's two additional assignments of error concerned the circuit court's disposition of her appeal bond and a recognizance she was required to sign by the GDC.

issue, because proof of PRA's ownership of the debt went to the ultimate success or failure of PRA's claim" rather than its status as a party alleging injury. *Id.* at 154. Additionally, the dissenting judge would not have reached the merits of PRA's alleged ownership of the debt because Green's articulation of her assignment of error limited the issue before the Court to that of standing. *Id.* at 155-56. Respecting Green's FDCPA claim, the dissenting judge would have affirmed the circuit court's denial of the claim. *Id.* at 156-57.

We granted PRA's petition for en banc review, which alleged the panel majority had "mistakenly equated standing and the merits of the case" and "erroneously evaluated [Green's] counterclaim." *Green v. Portfolio Recovery Assocs., LLC*, No. 0144-22-3, at *3, 7. Green subsequently moved this Court for leave to amend her first two assignments of error, and the motion was denied.[4] *Green v. Portfolio Recovery Assocs., LLC*, No. 0144-22-3 (Va. Ct. App. June 10, 2024) (order).

---

[4] Judge Ortiz's concurrence attempts to portray the proposed amendments as mere "*non-substantive*" alterations that would have left "the 'substance of the error[s] alleged' . . . unchanged." *Infra* at 23 and 25 (quoting *Whitt v. Commonwealth*, 61 Va. App. 637, 656 (2013) (en banc)). But this is not the case. The assignments of error Green originally placed before the Court, which the panel ruled on and were the assignments of error upon which PRA relied in electing to petition for rehearing, are stated in full below, together with the alterations requested by Green:

> (1) The trial court erred as a matter of law by finding that PRA was entitled to judgment against Ms. Green. That finding was error because PRA lacked standing to sue ~~and this violated due process~~, and because PRA failed to establish that it had a legal right to the debt it sought to enforce.
>
> (2) The trial court erred as a matter of law by finding that Ms. Green's FDCPA counterclaim failed ~~because her counterclaim was never heard~~ on the merits based on its finding that PRA's affirmative claim succeeded~~, violating due process~~.

*Green v. Portfolio Recovery Assocs., LLC*, No. 0144-22-3. The amended first assignment of error thus would have eliminated a due process issue while adding a new issue following the coordinating conjunction "and." *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 236 (2011) (noting

- 6 -

## II. ANALYSIS

### A. Standing

PRA sought rehearing en banc on Green's first assignment of error, alleging the panel majority erred in its resolution of the standing issue by erroneously equating standing and the merits of the case.

As our Supreme Court recently reiterated, "standing to maintain an action is a preliminary jurisdictional issue having no relation to the substantive merits of an action."[5] *Morgan v. Bd. of Supervisors of Hanover Cnty.*, 302 Va. 46, 58 (2023) (quoting *McClary v. Jenkins*, 299 Va. 216, 221 (2020)). "The concept of standing concerns itself with the characteristics of the person or entity who files suit," *id.* (quoting *Anders Larsen Tr. v. Bd. of Supervisors of Fairfax Cnty.*, 301 Va. 116, 120 (2022)), and "as 'a preliminary jurisdictional issue,' the standing doctrine asks only whether the claimant truly has 'a personal stake in the outcome of the controversy,'" *id.* at 59 (quoting *McClary*, 299 Va. at 221-22). Accordingly, "courts must not 'conflate the threshold standing inquiry with the merits of [a litigant's] claim.'" *Id.* at 63 (alteration in original) (quoting *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 312 (4th

---

that "linking independent ideas is the job of a coordinating conjunction like 'and'" (*cited with approval in Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 545 n.16 (2023))). The amended second assignment of error would have eliminated an allegation of procedural due process error by the trial court and replaced it with an allegation of error in a merits finding. The concurrence's argument in favor of granting these substantive amendments is grounded in the claim that the replacement amendments "sought to simply state explicitly what Green had already clearly intended"; yet if Green's intentions in her assignments of error had been "already clear[]," there would have been no need to amend them. *Infra* at 24-25.

[5] Although Green contends in her en banc briefing that the circuit court was required to "review the intertwined merits issues" in its standing analysis, that argument is based on mere dicta. *See Seymour v. Roanoke Cnty. Bd. of Supervisors*, 301 Va. 156, 166 n.3 (2022). Further, even assuming, without deciding, that PRA's evidence was insufficient to prove its ownership of the debt on the merits at trial, that would not be dispositive in the instant case, because standing was challenged pre-trial by Green's motion for summary judgment. As discussed above, PRA adduced sufficient evidence to survive that preliminary, gatekeeping challenge.

Cir. 2009)). For "[n]early every form of judicial relief . . . requires proof of a specific legal right that was infringed and that is capable of being remedied by a court." *Id.* at 58-59. Thus, "[i]f the standing analysis simply tracked th[e] decisional sequence on the merits," the result could be "an absurdity: A court would never be able to decide the merits of a claim against a claimant because that would mean the court never had jurisdiction to address the merits in the first place." *Id.* at 59. Based on this guidance, we conclude that the panel majority's consideration of evidence that was only presented at trial in this case, and its on-the-merits analysis of the ownership of the debt, was inappropriate.

Upon the record before us, standing was properly argued and ruled on as a threshold matter consequent to Green's pre-trial motion for summary judgment. The question we must therefore address is limited to whether the circuit court erred in denying Green's motion for summary judgment based on standing.[6]

"In an appeal from a circuit court's decision to grant or deny summary judgment, we review the application of the law to undisputed facts de novo." *Stahl v. Stitt*, 301 Va. 1, 8 (2022). "A trial court may appropriately grant summary judgment only in cases in which no material facts are genuinely in dispute." *Klaiber v. Freemason Assocs.*, 266 Va. 478, 484 (2003); *see also* Rule 3:20. It is therefore "not appropriate" to grant a request for entry of summary judgment when "the evidence is conflicting on a material point or if reasonable persons may draw different

---

[6] As noted above, in her first assignment of error, Green asserted the trial court erred "by finding that PRA was entitled to judgment against [her]. That finding was error because PRA lacked standing to sue and this violated due process." This language necessarily limited the scope of Green's assignment of error solely to the issue of standing, and not the merits of the ownership of the debt. *See Moison v. Commonwealth*, 302 Va. 417, 420 (2023) (noting that "the syntax of [an] assignment of error cabins the error that this Court can consider"). And while not unsympathetic to Green as a *pro se* appellant, we note that under our controlling Virginia law, a party "who represents h[er]self is no less bound by the rules of procedure and substantive law than a [party] represented by counsel." *Hammer v. Commonwealth*, 74 Va. App. 225, 236 (2022) (quoting *Townes v. Commonwealth*, 234 Va. 307, 319 (1987)).

conclusions from the evidence" on the motion. *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009). "Moreover, 'the decision to grant a motion for summary judgment is a drastic remedy.'" *Klaiber*, 266 Va. at 484 (quoting *Turner v. Lotts*, 244 Va. 554, 556 (1992)). Its "purpose is to expedite litigation," but "not [to] substitute a new method of trial where an issue of fact exists." *Turner*, 244 Va. at 557 (quoting *Leslie v. Nitz*, 212 Va. 480, 481 (1971)). "[O]ur review of the record is limited to the parties' pleadings, requests for admissions, and interrogatories," *Klaiber*, 266 Va. at 484, and according to "well-settled principles, we review . . . [them] applying the same standard a trial court must adopt in reviewing a motion for summary judgment, accepting as true those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason," *Stahl*, 301 Va. at 8 (quoting *Fultz*, 278 Va. at 88).

For purposes of summary judgment, "[t]he materiality of a fact depends upon whether it is 'a matter that is properly at issue in the case,' a determination requiring the court to view the putative factual dispute through the prism of the controlling legal principles." *AlBritton v. Commonwealth*, 299 Va. 392, 403 (2021) (citation omitted) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 635 (2016)). And "[a] factual issue is genuinely in dispute when reasonable factfinders could 'draw different conclusions from the evidence,' not only from the facts asserted but also from the reasonable inferences arising from those facts." *Id.* (citation omitted) (quoting *Fultz*, 278 Va. at 88).

Here, the controlling legal principles raised by Green's motion for summary judgment concerned standing to sue on a warrant in debt. PRA's standing in this case—its legal right to pursue a warrant in debt against Green and seek a disposition affecting its rights—turned on its claim that it was the assignee of the debt and that Green was a party to the contract by which the debt arose. *See, e.g.*, *Pollard & Bagby, Inc. v. Pierce Arrow, L.L.C.*, 258 Va. 524, 528 (1999).

By moving for summary judgment alleging lack of standing, Green necessarily contended that there were no material facts genuinely in dispute respecting PRA's claim that it was the assignee and Green was liable for the debt. But based on the pleadings and documents that were before the circuit court at the summary judgment hearing, as viewed in the light most favorable to PRA, there were such facts genuinely in dispute. PRA asserted that it was the successor-in-interest of a CIT Bank credit account, and submitted bills of sale, an assumption agreement, an affidavit of sale, and a declaration by its custodian of records that it claimed demonstrated its chain of title to the account. In her motion for summary judgment and accompanying memorandum, Green alleged shortcomings in these documents to support her assertion that PRA lacked "valid proof of assignment." But reasonable fact-finders could draw different conclusions about whether these documents sufficed to advance PRA's claim. Likewise, PRA contended that Green was the person who had "utilized" the account and that she was thus liable for the defaulted "amount that is due and owing," i.e., $8,914.31. In support of its argument, PRA provided a "data sheet" and account billing statements bearing Green's name, address, and a certain account number. Green's motion and supporting memorandum noted that the "original account number" and the billing statement account number differed, and alleged that there was no "proof" that the numbers referred to the same account or that she had been a party to the contract on the "original" account. But again, reasonable fact-finders could arrive at different conclusions about whether PRA's chain of title documents, taken together with the account holder's identifying information, were sufficient to advance PRA's claim.

Because material facts concerning the alleged assignment of the debt and Green's alleged contractual obligation to satisfy the debt were in dispute, entering summary judgment in favor of Green would have been inappropriate. *Fultz*, 278 Va. at 88. The circuit court therefore did not err in denying Green's motion for summary judgment based on an alleged lack of standing.

B.  The FDCPA Claim

PRA also sought rehearing en banc with respect to Green's FDCPA claim.  Green assigned error to the circuit court on the ground that it erred by denying her FDCPA claim, because the claim "was never heard violating due process."  We hold that the circuit court did rule on Green's FDCPA claim, but that doing so was error because based on the record before us, the circuit court never had jurisdiction over that claim.

"Subject matter jurisdiction 'can be acquired only by virtue of the Constitution or of some statute.'"  *Afzall v. Commonwealth*, 273 Va. 226, 230 (2007) (quoting *Bd. of Supervisors v. Bd. of Zoning Appeals*, 271 Va. 336, 344 (2006)).  Relevant here, Code § 17.1-513 provides that circuit courts "shall have appellate jurisdiction of all cases . . . in which an appeal . . . may, as provided by law, be taken . . . from or to the judgment or proceedings of any inferior tribunal."  But where a party fails to perfect an appeal from the GDC to the circuit court, "the circuit court does not obtain jurisdiction" over the matter; "[i]ndeed, we consistently have held that the failure to comply with rules governing appeals precludes 'the exercise of the jurisdiction of the circuit court over the proceedings.'"  *Hurst v. Ballard*, 230 Va. 365, 367 (1985) (quoting *The Covington Virginian v. Woods*, 182 Va. 538, 548 (1944)); *see also* Code §§ 16.1-106 and -107 (providing procedural requirements for appealing an order or judgment of the GDC to the circuit court).  "[T]he lack of subject matter jurisdiction can be raised at any time in the proceedings, even for the first time on appeal by the [reviewing] court sua sponte."  *Watson v. Commonwealth*, 297 Va. 347, 352 (2019) (quoting *Morrison v. Bestler*, 239 Va. 166, 170 (1990)).  "We review the trial court's jurisdiction *de novo*."  *Jackson v. Jackson*, 69 Va. App. 243, 247 (2018).

Here, the record reflects that PRA filed its warrant in debt against Green on December 18, 2020, and the GDC designated the matter Case No. GV20-670.  Green filed her grounds of defense in that case on March 10, 2021, in which she "allege[d] a [c]ounterclaim" that PRA had

- 11 -

violated the FDCPA. Three days prior to the case being heard in the GDC, the court informed Green that she had to file a warrant in debt for her FDCPA claim to be considered. The record contains a copy of Green's warrant in debt against PRA, which indicates Green was "[f]iling [a] lawsuit in violation [of the] Fair Debt Collections Practice Act [sic]." The warrant in debt was filed September 10, 2021, and the GDC designated the action Case No. GV21-462.

The record also indicates that at a hearing on September 13, 2021, the GDC ruled in PRA's favor on the credit account debt but that "Green's FDCPA counterclaim was dismissed without being heard. *See* GV21-462 Record."[7] The record before us contains a copy of the completed warrant in debt form filed by PRA in Case No. GV20-670, signed by the GDC judge on September 13, 2021, and indicating a disposition of judgment against Green. The form contains no mention of any FDCPA claim or a ruling thereon.

On September 20, 2021, Green filed a motion for a new trial in the GDC, but only in Case No. GV20-670, i.e., only in the case on PRA's warrant in debt against her. Neither in her motion nor her accompanying affidavit did Green assert or allege any FDCPA violations by PRA. And when Green filed her appeal from the GDC to the circuit court, she appealed only Case No. GV20-670. Indeed, the circuit court's order of January 3, 2022 states that the parties appeared before it "on [Green's] appeal of the [GDC's] decision in the matter of [PRA] v. Mazie Green, Case No: GV20000670-00," i.e., only on PRA's warrant in debt against Green. The record lacks any documentation that Green filed an appeal of her FDCPA claim in Case No. GV21-462.

---

[7] The record before us includes a screen capture of a webpage from the Virginia Judiciary Online Case Information System for the Alleghany County GDC. The document reflects that Case No. GV21-462, a warrant in debt against PRA filed by Green on September 10, 2021, was dismissed following a September 13, 2021 hearing date, at which the "Result" of the matter was "Other."

Accordingly, the record reflects that Green appealed only the case concerning PRA's claim against her, and did not appeal her FDCPA claim from the GDC to the circuit court.[8]  And because Green's FDCPA claim was never appealed to the circuit court, the circuit court never acquired subject matter jurisdiction over that claim and it was error for the circuit court to rule on on it.[9]  *See Miller v. Potomac Hosp. Found.*, 50 Va. App. 674, 684 (2007) ("[A]ny judgment rendered without [subject matter jurisdiction] is void *ab initio*." (quoting *Nelson v. Warden*, 262 Va. 276, 281 (2001))).

### C. Recognizance

The panel unanimously held that this Court lacks jurisdiction to consider Green's argument respecting her recognizance in the GDC.  *Green*, 80 Va. App. at 150-51.  Green neither petitioned nor cross-petitioned for rehearing en banc on that issue, and the Court did not grant rehearing on that issue on its own motion.  That issue is thus not before us for en banc review,[10] and the panel's holding as to that issue remains undisturbed.  *See* Rule 5A:35(b)(1).

---

[8] To the extent Green attempted to place her FDCPA claim before the circuit court by moving to amend her grounds of defense in PRA's claim, that motion sought only to "amend her GROUNDS OF DEFENSE from appealed case GV20000670-00," which case, as noted above, did not encompass her claim against PRA.  And also as noted above, the record contains no ruling by the circuit court on Green's motion, and where there is no ruling on the matter by the circuit court, there is nothing for us to review on appeal.  *See Forest Lakes Cmty. Ass'n v. United Land Corp. of Am.*, 293 Va. 113, 131 (2017).

[9] This error is not subject to harmless error analysis, because only errors that "do[] not implicate the trial court's subject matter jurisdiction [are] subject to harmless-error analysis." *Spruill v. Garcia*, 298 Va. 120, 127 (2019).

[10] Likewise, Green's assignment of error respecting the circuit court's disposition of her appeal bond, which the panel did not reach, was not the subject of a petition or cross-petition for rehearing en banc and the Court did not grant rehearing on that issue on its own motion. Because the panel never ruled on the issue and the issue is not before the Court for rehearing en banc, it is waived.

## III. CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment, with the exception of its ruling on Green's FDCPA claim. We reverse that ruling, based on our holding that the circuit court lacked jurisdiction to consider that claim. Additionally, because it was not subject to en banc rehearing, that portion of the panel opinion holding that this Court lacks jurisdiction to consider Green's recognizance argument (Analysis Section III) remains undisturbed and the panel's mandate as to that issue is reinstated. We vacate the remainder of the panel's mandate.

*Affirmed in part, and reversed in part.*

Raphael, J., concurring.

I am pleased to join the majority opinion. I write separately to highlight the jurisprudential flaw in appellant Mazie Green's position and the practical problems that would result from adopting it.

In fairness to Green, one could reasonably view a creditor's failure to prove that it bought the debt as *both* a failure to prove the claim on the merits *and* a failure to prove an injury-in-fact that confers standing. After all, if a putative creditor never acquired the debt, how could it claim injury from not being paid? Yet Green asks that we do more than acknowledge that a failure of proof can be viewed through both lenses. She insists that a plaintiff's failure to prove injury must *always* be viewed as a failure to prove standing, thus requiring the claim to be dismissed for lack of standing even after a full trial on the merits. That novel theory lacks merit.[11]

Although Green relies heavily on federal standing doctrine, even federal cases do not adopt the rule she advocates. Green repeatedly invokes *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), but *Lujan* does not stand for that proposition. The environmental group there challenged an Endangered Species Act regulation. *Id.* at 557-58. Noting that standing is "an indispensable part of the plaintiff's case, each element [of which] must be supported . . . at the

---

[11] As Judge Ortiz shows in his separate opinion, Green's novel theory of standing is the byproduct of our denying her counsel's motion for leave to amend her assignment of error to let her argue simply that PRA failed to prove that it bought the debt. I empathize with the challenge Green faced as an unrepresented litigant in the trial court and before the three-judge panel here. She acquitted herself remarkably well. Still, I joined the majority in denying leave to modify the assignment of error because granting it would have sidestepped the important question about the law of standing that we found worthy of en banc consideration. It would have converted this case into a run-of-the-mill sufficiency-of-the-evidence appeal that does not normally warrant the involvement of all 17 appellate judges. In other words, amending the assignment of error would have distorted the function of en banc review. Since then, the Supreme Court has amended Rule 5A:35(b)(2), effective November 25, 2024, to make clear that such substantive changes are not allowed: the "appellant may not change an assignment of error from the one assigned before the panel but may seek leave of Court to make technical corrections or *non-substantive* changes that do not prejudice the appellee." Order (Va. Sept. 26, 2024) (emphasis added).

successive stages of the litigation," *id.* at 561, the Court held that the environmental group failed on summary judgment to prove standing, *id.* at 578. But *Lujan* did not involve a case like this one, where the merits are inextricably intertwined with whether the plaintiff has standing.

"Proof of damages is an essential element of a breach of contract claim, and failure to prove that element warrants dismissal of the claim." *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 156 (2009). If a trial on the merits shows that the breach-of-contract plaintiff cannot prove any injury, must the case be dismissed for lack of standing instead of on the merits? Green says yes.

But federal caselaw counsels that district courts proceed to decide the case on the merits when standing and the merits are inextricably intertwined. For instance, the Fourth Circuit has said that "[n]o purpose is served by indirectly arguing the merits in the context of federal jurisdiction. Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009) (quoting *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981)). In other words, when "the jurisdictional facts 'are so intertwined with the facts upon which the ultimate issues on the merits must be resolved,' [then] 'the entire factual dispute is appropriately resolved only by a proceeding on the merits.'" *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219-20 (4th Cir. 1982)).

Green is mistaken that a different conclusion is compelled by *Anders Larsen Trust v. Board of Supervisors*, 301 Va. 116 (2022). The Court held that the complaint there alleged sufficient facts at the demurrer stage to prove the neighbors' standing to challenge the county's land-use decision to allow by-right development of a residential treatment center. *Id.* at 123. But while proof of injury is needed for standing to challenge a local land-use decision, it is not an

element of the underlying claim against the local governing body. Thus, the failure to prove standing at *any* stage of such litigation would require that the court "dismiss the case for lack of standing." *Id.* at 123 n.5. The Court did not purport to apply that rule to cases like this one, where proof that the plaintiff was injured is required both to show standing and to win on the merits.

Our Supreme Court has given its nod of approval to the federal approach to resolving intertwined cases. *See Seymour v. Roanoke Cnty. Bd. of Supervisors*, 301 Va. 156, 168 n.3 (2022). The Court in *Seymour* explained that a finding at the demurrer stage that a plaintiff has pleaded enough facts to allege standing does not prevent revisiting the standing question later "at an ore tenus hearing prior to trial." *Id.* But the Court added, quoting the Fourth Circuit, that "when the 'jurisdictional facts and the facts central to [the underlying] claim are inextricably intertwined, the trial court should ordinarily assume jurisdiction and proceed to the intertwined merits issues.'" *Id.* (quoting *Kerns*, 585 F.3d at 193). To be sure, that language was dictum. *Accord ante* at 7 n.5. But Green has not cited *any* caselaw holding that when standing and the merits are inextricably intertwined, the plaintiff's failure at trial to prove injury requires the case to be dismissed for lack of standing, rather than on the merits.

Accepting Green's novel theory would lead to odd results. Suppose, for instance, that the trial court here had found that PRA's claim against Green failed on the merits because PRA never proved its chain of title in acquiring the debt. Green's counsel told us at oral argument that the trial court in that instance would have committed reversible error by *not* dismissing the case for lack of standing.

Such a result would be counterintuitive and bizarre. "If the standing analysis simply tracked . . . the merits, it could create an absurdity: A court would never be able to decide the merits of a claim against a claimant because that would mean the court never had jurisdiction to

address the merits in the first place." *Morgan v. Bd. of Supervisors of Hanover Cnty.*, 302 Va. 46, 59 (2023). *See also Green v. City of Raleigh*, 523 F.3d 293, 299 (4th Cir. 2008) ("'[A] plaintiff's standing to bring a case does not depend upon his ultimate success on the merits underlying his case,' because otherwise '"every unsuccessful plaintiff will have lacked standing in the first place."'" (quoting *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 (4th Cir. 2007)); *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 489 (6th Cir. 2021) ("Yet just because a plaintiff's claim might fail on the *merits* does not deprive the plaintiff of *standing* to assert it. 'If that were the test, every losing claim would be dismissed for want of standing.'" (citation omitted) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092 (10th Cir. 2006) (en banc))).

The oddity of that result would be even stranger if a dismissal for lack of standing had to be without prejudice to refiling. A dismissal "with prejudice" means "an adjudication on the merits[] and final disposition, barring the right to bring or maintain an action on the same claim." *Reed v. Liverman*, 250 Va. 97, 99 (1995) (quoting *Black's Law Dictionary* 469 (6th ed. 1990)). Federal courts consistently hold that it is error to dismiss a case "with prejudice" for lack of standing, for if a federal court lacks jurisdiction to decide the claim, it cannot render a binding decision on the merits.[12] In light of federal practice, Green's counsel ventured at oral argument

---

[12] "Dismissal for lack of subject matter jurisdiction is not a judgment on the merits, and it therefore has no claim preclusive or res judicata effect." 2 Daniel R. Coquillette et al., *Moore's Federal Practice—Civil* § 12.30 (2024). On that rationale, every federal circuit has held that a dismissal for lack of standing should be "without prejudice." *See, e.g.*, *Xavier v. Evenflo Co.*, 54 F.4th 28, 42 & n.7 (1st Cir. 2022), *cert. denied*, 144 S. Ct. 93 (2023); *Harty v. W. Point Realty, Inc.*, 28 F.4th 435 (2d Cir. 2022); *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 164 & n.7 (3d Cir. 2017); *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013); *Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, 104 F.4th 383, 396 (5th Cir. 2024); *Ward v. Nat'l Patient Acct. Servs. Sols.*, 9 F.4th 357, 363 (6th Cir. 2021); *White v. Ill. State Police*, 15 F.4th 801, 808 (7th Cir. 2021); *Dalton v. NPC Int'l, Inc.*, 932 F.3d 693, 696 (8th Cir. 2019); *Barke v. Banks*, 25 F.4th 714, 721-22 (9th Cir. 2022); *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 817 n.7 (10th

- 18 -

that PRA's claim would also have to be dismissed without prejudice here.  If so, PRA would get another chance to sue Green, perhaps coming up with better chain-of-title evidence the next time.[13]

It takes little imagination to see the inefficiency of that approach.  Green's proposal would create a zombie-like doctrine of standing—claims judicially killed after a trial on the merits for failure to prove injury could be revivified the next day for the plaintiff to try again.  The Court wisely declines to breathe life into that peculiar theory here.

Cir. 2021); *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1235 (11th Cir. 2021); *Jibril v. Mayorkas*, 20 F.4th 804, 813 (D.C. Cir. 2021); *Fieldturf, Inc. v. Sw. Rec. Indus.*, 357 F.3d 1266, 1269 (Fed. Cir. 2004).  *But see Fieldturf*, 357 F.3d at 1269 ("On occasion, however, a dismissal with prejudice is appropriate, especially where 'it [is] plainly unlikely that the plaintiff [will be] able to cure the standing problem.'" (alterations in original) (quoting *H.R. Techs., Inc. v. Astechnologies, Inc.*, 275 F.3d 1378, 1385 (Fed. Cir. 2002))).

[13] Our appellate courts have sometimes affirmed a with-prejudice dismissal for lack of standing without addressing whether the dismissal should have been *without prejudice* instead.  *See Platt v. Griffith*, 299 Va. 690, 691-93 (2021) (per curiam); *Layla H. v. Commonwealth*, 81 Va. App. 116, 140 (2024).  The parties have not briefed that question here.  And the Court's affirmance of the judgment against Green makes it unnecessary to decide if Virginia should follow federal law in requiring that dismissals for lack of standing be without prejudice.

Ortiz, J., concurring, with whom Lorish, J., joins, concurring as to Part II.

I reluctantly concur in the Court's analysis because I agree that PRA had standing to bring a claim against Green and therefore that the trial court should be affirmed. I also agree that the trial court lacked subject matter jurisdiction to hear Green's FDCPA claims. But I write separately to emphasize first, the prior actions by this Court that prevented a self-represented, or "*pro se*,"[14] litigant from having the opportunity to be meaningfully heard by the en banc Court. And, second, I write to note my concern with the Court's reliance on a line of criminal cases in strictly interpreting pleadings filed by a self-represented civil litigant.

I. Because the Court erred in denying Green's motion to amend her assignments of error, today's decision should not have turned on standing.

The Court's decision today did not occur in a vacuum. For the bulk of these proceedings, Mazie Green was unrepresented. Green argued two trials—including filing motions, entering evidence, and cross-examining witnesses—and a panel appeal before this Court completely on her own. It was not until after the Court granted PRA's motion for rehearing en banc that Green obtained counsel.[15] Counsel for Green subsequently filed a motion to amend her assignments of error, which she had written at the panel appeal stage while unrepresented. The Court denied Green's motion in an order, cabining her arguments en banc to her original assignment of error. *Green v. Portfolio Recovery Assocs.*, No. 0144-22-3 (Va. Ct. App. June 10, 2024) (order). Joined by several of my colleagues, I authored a dissent. *Id.*, slip op. at 4-11 (Ortiz, J., dissenting).

---

[14] I use the term "self-represented" rather than "*pro se*" because, as today's case shows, among the manifold obstacles facing self-represented parties are legal terms of art that could easily be described with more common vernacular.

[15] Counsel for Green served in a pro bono capacity at the en banc proceeding. As the Chief Judge noted at oral argument, the entire Court appreciates their willingness to serve in such a capacity.

The Court's decision was based on language in 5A:35 that has since been amended as of November 25, 2024. *See* Order (Va. Sept. 26, 2024). As I explain below, however, the amendments do not alter the logic of either the Court's order or my dissent. Because I continue to believe the Court's order denying Green's motion to amend was in error and led to today's outcome, I reiterate my disagreement with that decision here.

Green's arguments in her defense were consistent throughout the time that she remained unrepresented, focusing on the merits of PRA's claim and its failure of proof. In her amended grounds for defense before the trial court, Green "denie[d] that [PRA] [wa]s entitled to recovery in this action" because PRA "fail[ed] to show a valid chain of title . . . for any specific debt or proof of ownership." She noted that, while PRA "alleged that the [o]riginal [c]reditor is C[IT] Bank with original account ending number 7068," the account ending number on the PayPal statement "that they are demanding money for is 8616." In a motion styled "motion for summary judgment plaintiff lacks standing," Green asserted that PRA "has (1) no valid proof of assignment, (2) no proof that the original account number ending in 7068 changed to account number ending in 8616, and (3) . . . no contract for C[IT] Bank account ending in 7068." Green asserted that, because of these evidentiary failures, PRA "lack[ed] standing," but she focused on the gaps in PRA's evidence that it owned the debt.

On appeal, consistent with Green's earlier terminology, she raised the following assignment of error: "The trial court erred as a matter of law by finding that PRA was entitled to judgment against Ms. Green. That finding was error because PRA lacked standing to sue and this violated due process." But, despite framing the issue as one of "standing," on brief and at oral argument, she challenged PRA's failure on the merits to prove that it owned the debt. Green challenged the mismatch of account numbers, and she challenged the lack of evidence showing which accounts were sold under each bill of sale, arguing that "PRA's [bill of sale documents]

- 21 -

lack the attachments that identify any names and account numbers sold to them" and asserting several other defects in the evidence. Though she conflated the issue of failing to prove assignment or ownership with the legal doctrine of standing, her arguments were clear to the panel and to PRA, who noted her use of the term "standing" in her assignment of error but replied on the merits, asserting that the trial court's factual findings were not "plainly wrong."

At the en banc stage, counsel for Green filed a motion to amend the assignments of error. The new first assignment would have read: "The trial court erred as a matter of law by finding that PRA was entitled to judgment against Ms. Green. That finding was error because PRA lacked standing to sue *and because PRA failed to establish that it had a legal right to the debt that it sought to enforce*." (Emphasis added). Thus, although Green had always understood the word "standing" to refer to the merits of her case, her new assignment, edited by counsel, would have explicitly separated legal standing from the merits of her case.

Denying Green's motion, the Court opined that Rule 5A:35(b)(1) "dispositively" determined "whether a party may amend assignments of error at the en banc stage." *Green*, slip op. at 1 (majority). Rule 5A:35(b)(1) stated at the time:

> Issues Considered Upon Rehearing En Banc. Only issues raised in the petition for rehearing en banc and granted for rehearing or included in the grant by this Court on its own motion are available for briefing, argument, and review by the en banc Court. This Court may grant a petition in whole or in part.[16]

The Court held that "[w]here . . . a party to a panel decision has petitioned for rehearing en banc, the issues considered by the Court are limited to those 'issues raised [by the party] in [its]

---

[16] Our Supreme Court has since amended Rule 5A:35(b)(1). Order (Va. Sept. 26, 2024). The slightly altered language now reads in relevant part: "Review by the en banc Court is limited to those *matters* raised in the petition for rehearing en banc for which the Court granted rehearing and those *matters* included in the grant by this Court on its own motion." *Id.* (emphasis added). Although the amended language now refers to "matters," rather than "issues," it does not appear that this change would have impacted the Court's reasoning had the order been decided today.

petition' and then granted by the Court." *Green*, slip op. at 1 (alterations in original) (quoting Rule 5A:35(b)(1)). Thus, the Court reasoned, because in its petition for rehearing PRA framed the issue as the panel "mistakenly equat[ing] standing and the merits of the case," under "the plain language of Rule 5A:35(b)(1)," Green's amendment would impermissibly exceed the scope of the substantive issues raised for rehearing. *Id.*, slip op. at 2.

In dissent, I noted my disagreement with the majority's conclusion that Green sought "a substantive revision of the issues on appeal before the full Court." *Id.*, slip op. at 2 n.2. Rather, Green was merely making a *non-substantive amendment* to "correct a formal defect and to remedy an error of oversight," which we had the authority to allow under *Whitt v. Commonwealth*, 61 Va. App. 637, 648 (2013) (en banc). In *Whitt*, this Court laid out the proper analysis for evaluating when an assignment of error may be amended. The Court began with the understanding that "under the common law, courts, including appellate courts, can permit amendments to pleadings." *Whitt*, 61 Va. App. at 649. "[B]oth this Court and the Supreme Court of Virginia routinely have permitted or ordered litigants to file amended briefs to correct a range of deficiencies . . . ." *Id.* As to assignments of error, "an appellate court may entertain a motion to amend an assignment of error once a timely notice of appeal and petition for appeal have been filed." *Id.* at 656. So long as an amendment "does not change the substance of the error alleged," this Court may grant it. *Id.* (quoting *Allstate Ins. Co. v. Gauthier*, 273 Va. 416, 418 (2007)). Further, the issues raised in the amended assignment must have been presented to the trial court, and the Court may consider any prejudice inherent in the amendment in determining whether to grant it. *Id.* at 659.

As Judge Raphael notes, our Supreme Court has since amended Rule 5A:35(b)(2) to formally codify the distinction set forth in *Whitt* between "formal defect[s]" and substantive amendments. The Rule now includes the following language: "The appellant may not change an

assignment of error from the one assigned before the panel but may seek leave of Court to make technical corrections or non-substantive changes that do not prejudice the appellee." Order (Va. Sept. 26, 2024); *see supra* at 15 n.11 (Raphael, J., concurring). So, because the rule is merely a restatement of *Whitt*'s principle, my disagreement with the Court's order would today be grounded in the Rules rather than in *Whitt*, but the substance and logic of my dissent remains unchanged.

Returning to the Court's order, while the majority correctly pointed out that our en banc review is restricted to "issues" (now "matters") "raised in the petition for rehearing," Rule 5A:35(b)(1), I believe it erred by failing to exercise its authority under *Whitt* to permit a *non-substantive amendment* to an assignment of error after a petition for en banc review has been granted. This is because Green consistently argued the same issues throughout the trial and appeal.

While "standing" has a known legal meaning, when used in a *pro se* assignment of error, and in context with Green's arguments at trial and on brief, it is clear that Green meant to use the ordinary meaning of the word "standing"—"a position from which one may assert or enforce legal rights and duties." *Standing*, Merriam-Webster, https://www.merriam-webster.com/dictionary/standing (last visited Dec. 16, 2024). Substituting this dictionary definition in Green's original assignment of error, it asserts that the trial court's judgment in favor of PRA "was error because PRA lacked a position from which it could enforce the contract and this violated due process." This meaning is remarkably similar to her proposed amended assignment. In other words, when Green's counsel sought to simply state explicitly what Green had already clearly intended, the "substance of the error alleged" remained unchanged.[17]

---

[17] The Court responds to this assertion in a footnote, stating, "[Y]et if Green's intentions in her assignments of error had been 'already clear[],' there would have been no need to amend

- 24 -

Additionally, Green's challenge to PRA's proof had been raised throughout trial, and PRA responded to the merits of Green's defense at all stages of proceedings, showing that it, too, understood Green's argument. Thus, even though the self-represented Green had preserved and argued the merits of her claims time and again while using the word "standing," with no prejudice to PRA, the Court prevented Green from continuing to argue the merits en banc because of a technical failure to say "magic words."

Today, the Court arrives at the logical result of its decision to view Green's proposed amendment as a "substantive revision" rather than a "formal defect" or technical failure. Green has been forced to shape her defense—in a way she never did at trial—around the legal doctrine of standing, which, for the reasons correctly articulated by the Court's opinion, is an unavailing argument. This is an unjust and unnecessary result. Green should have had her day in court on an argument she bravely championed, unrepresented, throughout this case. In finding otherwise on her motion to amend, my colleagues closed the doors to litigants who lack the resources necessary to precisely and clearly articulate the legal terms of art necessary to win in court. Neither the rules nor our case law compelled such a result.

II. In future litigation, clarification is needed on the standards governing the interpretation of self-represented litigants' pleadings.

Because of the Court's decision to cabin Green's first assignment of error to PRA's "standing," legal standing was the only issue, under this assignment, that the parties argued. Counsel for Green did not argue that this Court should interpret her assignment to encompass the merits of her defense, and, therefore, it would have been inappropriate for the Court to reach the

them." *See supra* at 6 n.4 (majority opinion). But this reasoning is circular. As I have demonstrated, it is exactly *because* Green's intentions were "already clear[]" that her proposed amendment would have been merely technical, and thus wholly permissible under both *Whitt* and the now-updated Rule 5A:35(b)(2). My colleagues' comment, in fact, demonstrates exactly why Green's motion to amend should have been granted.

- 25 -

merits under that legal theory today.  *See Commonwealth v. Brown*, 279 Va. 235, 241 (2010) ("The Court of Appeals can only consider issues properly brought before it by the litigants."); *cf.* Rule 5A:20(e) (requiring preservation of legal arguments on brief by including "the standard of review and the argument (including principles of law and authorities) relating to each assignment of error").  Had counsel for Green advanced such a legal theory, however, or had our standards for interpreting self-represented pleadings been clearer to start, the result today may very well have been different.

Although the parties did not advance arguments on how to construe Green's pleading while unrepresented, in a footnote above, the Court discusses its interpretation of Green's first assignment of error.  *See supra* at 8 n.6 (majority opinion).  Again, the assignment reads: "The trial court erred as a matter of law by finding that PRA was entitled to judgment against Ms. Green . . . because PRA lacked standing to sue and this violated due process."  The Court notes that, while "not unsympathetic" to Green as a self-represented litigant, "under our controlling Virginia law, a party 'who represents h[er]self is no less bound by the rules of procedure and substantive law than a [party] represented by counsel.'"  *Supra* at 8 n.6 (alterations in original) (quoting *Hammer v. Commonwealth*, 74 Va. App. 225, 236 (2022)).  Thus, because "the syntax of [an] assignment of error cabins the error that this Court can consider," (and because this Court denied Green the opportunity to change it) Green's choice of language "necessarily limited the scope of Green's assignment of error solely to the issue of standing, and not the merits of the ownership of debt."  *Id.* (alteration in original) (quoting *Moison v. Commonwealth*, 302 Va. 417, 420 (2023)).

The Court arrives at its strict construction of Green's assignment through reliance on *Hammer v. Commonwealth*, 74 Va. App. 225 (2022), a criminal case descending from a line of criminal cases beginning with *Faretta v. California*, 422 U.S. 806 (1975).  In *Faretta*, the

Supreme Court held that, as a corollary to the Sixth Amendment right to counsel, a court could not constitutionally override a criminal defendant's knowing and voluntary waiver of that right. *Id.* at 832-34. In so holding, the Court stated in a footnote that "[t]he right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." *Id.* at 834 n.46. Relying on this footnote in *Faretta*, the Virginia Supreme Court subsequently held that "[a] *defendant* who represents himself is no less bound by the rules of procedure and substantive law than a defendant represented by counsel." *Church v. Commonwealth*, 230 Va. 208, 213 (1985) (emphasis added). Similar to *Faretta*, this statement in *Church* emanated from the issue of whether a criminal defendant had knowingly and voluntarily waived his right to counsel. *Id.* at 215-16. Today, the majority quotes this language via *Hammer*, which quotes *Townes v. Commonwealth*, 234 Va. 307, 319 (1987), which in turn quotes *Church*. *See supra* at 8 n.6; *Townes*, 234 Va. at 319 (quoting *Church*, 230 Va. at 213).

Although we have never expressly stated that the *Faretta* line is applicable to *civil* appeals in which a self-represented litigant is a party, I believe the Court is correct that self-represented civil litigants must comply with the "rules of procedure" and advance arguments with a basis in substantive law.[18] But today's opinion suggests that *Faretta* also requires the imposition of a strict construction rule for self-represented litigants—something federal courts applying *Faretta* have rejected.

The Court's reliance on this criminal line of cases in cabining the scope of Green's civil appeal raises several concerns, starting with the fact that Green is not a criminal defendant.

---

[18] *See, e.g.*, *Francis v. Francis*, 30 Va. App. 584, 591 (1999) (quoting *Townes*, 234 Va. at 319); *Morris v. Elias*, No. 0261-22-2, slip op. at 4, 2022 Va. App. LEXIS 567, at *6 (Nov. 9, 2022) (same); *Sowers v. Walker*, No. 2339-10-3, slip op. at 5, 2011 Va. App. LEXIS 155, at *7 (May 10, 2011) (same); *Chastain v. Bedford Reg'l Water Auth.*, No. 0233-22-3, slip op. at 6 n.4, 2022 Va. App. LEXIS 618, at 9 n.4 (Dec. 6, 2022) (quoting *Hammer*, 74 Va. App. at 236).

When quoting *Hammer*, the majority alters the original quotation, replacing the word "defendant" with "party" without explanation. *Supra* at 8 n.6. While seemingly inconsequential, this alteration overrides the critical distinction between Green's case and the *Faretta*/*Church* line of cases: a criminal defendant has a constitutional right to counsel and must consciously reject that opportunity to become self-represented, whereas civil defendants receive no such guarantee.

Because of the individual liberty interest at stake, the United States Constitution ensures that every criminal defendant, regardless of socioeconomic status, is guaranteed representation. *See* U.S. Const. amend. VI; *Gideon v. Wainwright*, 372 U.S. 335, 343-45 (1963). Thus, a criminal defendant—theoretically—need not worry about the financial impact of retaining a lawyer.[19] *Faretta* and its Virginia progeny emphasize that such unrepresented criminal defendants are bound by the rules of "procedure and substantive law" because they made the conscious and unpressured (even discouraged) choice to go unrepresented.

Civil litigants, however, face a remarkably different calculus. Of course, there is no civil right to counsel, which means that civil litigants face an enormous disincentive to retaining a lawyer that criminal defendants do not—namely, hefty counsel fees. Further, more often than not, money is what is at issue in a civil claim. Indigent civil litigants may be able to retain a legal aid attorney, but only if they meet certain criteria, such as being in an area with legal aid coverage, meeting financial stress requirements, and having subject matter the attorneys can handle. And, as relevant here, in 90% of cases concerning debt buyers, the debt buyer obtains default judgment against an unrepresented party. Br. Amici Curiae in Support of Appellant at 35.

---

[19] Although such defendants, if convicted, are often required to pay attorney's fees as part of their court fines. *See* Code § 19.2-163(2) ("If the defendant is convicted, the amount allowed by the court to the attorney appointed to defend him shall be taxed against the defendant as a part of the costs of prosecution . . . .").

- 28 -

It is thus increasingly likely that we will see more litigation by unrepresented parties in this context, specifically.

Next, having substituted "defendant" for "party," the Court injects this principle of criminal law into its *interpretation* of Green's assignment of error. Relying on *Moison*, 302 Va. 417, for the relevant "rule[] of . . . substantive law," *Hammer*, 74 Va. App. at 236, the Court states that Green's choice of words "necessarily limited the scope of Green's assignment of error solely to the issue of standing, and not the merits of the ownership of debt." *Supra* at 8 n.6 (citing *Moison*, 302 Va. at 420). But *Faretta/Church* does not demand that the Court apply *Moison*'s rule of strict construction. While *Church* requires that self-represented criminal defendants not be excused from the fundamental "rules of procedure and substantive law," it does not address how reviewing courts should *construe* those pleadings. As an example, while *Church* would require an unrepresented criminal defendant to comply with Rule 5A:20 by listing her assignments of error, neither *Church* nor our rules provide guidance for how this Court should interpret them or which rules of construction to apply. In fact, while federal courts and numerous other state courts have established rules of liberal construction for self-represented litigants' pleadings,[20] Virginia courts have not precedentially spoken on the topic.

Federal caselaw demonstrates that the United States Supreme Court's admonition in *Faretta* was about compliance with court procedures and never intended to open the door for a rule of strict construction, let alone in civil cases. In federal courts, notwithstanding *Faretta*,

---

[20] *See, e.g.*, *Minshall v. Johnston*, 417 P.3d 957, 961 (Colo. App. 2018); *State v. Redding*, 444 P.3d 989, 993 (Kan. 2019); *Nabelek v. Bradford*, 228 S.W.3d 715, 717 (Tex. Ct. App. 2006); *Wirtz v. Glanz*, 932 P.2d 540, 541 (Ok. Civ. App. 1996), o*verruled on other grounds by Pellegrino v. State ex rel. Cameron Univ. ex rel. Bd. of Regents*, 63 P.3d 535 (Okla. 2003); *Kozicki v. Unemployment Comp. Bd. of Rev.*, 299 A.3d 1055, 1063 (Pa. Commw. Ct. 2023); *Simms v. State*, 976 A.2d 1012, 1018 (Md. 2009); *Elmore v. Stevens*, 824 A.2d 44, 46 (D.C. 2003); *Amek Bin-Rilla v. Israel*, 335 N.W.2d 384, 388 (Wis. 1983); *Oldham v. Tenn. Dep't of Correction*, No. M1998-00852-COA-RC-CV, 2000 Tenn. App. LEXIS 162, at *4 (Mar. 16, 2000).

self-represented pleadings are "liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see* Am. Jur. 2d *Pleading* § 91 (2021). This is an outgrowth of the requirement in the Federal Rules that "[p]leadings must be construed so as to do justice," a reflection of broader due process principles. Fed. R. Civ. P. 8(e); *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing Federal Rule 8(e)'s predecessor as support for liberal construction of *pro se* pleadings). Federal courts of appeals do the same in their review. *See Pleading*, *supra*, § 92; *e.g.*, *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1311 (10th Cir. 2010) ("[T]his court construes a *pro se* party's pleadings liberally." (quoting *Hammons v. Saffle*, 348 F.3d 1250, 1254 (10th Cir. 2003))). In fact, federal courts carefully distinguish this rule of liberal construction from *Faretta*'s requirement that self-represented litigants comply with the rules of procedure and substantive law.[21] Thus, to the extent that *Faretta* is perfectly consistent with—and distinct from—federal courts' "understanding eye" when interpreting self-represented pleadings, *Kiebala v. Boris*, 928 F.3d 680, 684 (7th Cir. 2019), we should assume that, when our Supreme Court incorporated *Faretta* into its analysis in *Church*, it similarly did not intend for *Church* to be applied to the construction of self-represented-litigant pleadings.

As discussed, the Supreme Court of Virginia has only ever relied on *Faretta* to hold self-represented criminal defendants to our procedural rules; it has never implied that *Faretta* extended to the interpretation of pleadings in civil cases. *See Church*, 230 Va. at 213-14 (relying

---

[21] *See Parkell v. Danberg*, 833 F.3d 313, 324 n.6 (3d Cir. 2016) ("Although courts liberally construe *pro se* pleadings, unrepresented litigants are not relieved from the rules of procedure and the requirements of substantive law." (citing *Faretta*, 422 U.S. at 834 n.46)); *Green v. Dep't of Educ. of N.Y.*, 16 F.4th 1070, 1074 (2d Cir. 2021) ("[W]hile 'we liberally construe pleadings and briefs submitted by pro se litigants . . .' pro se appellants must still comply with [the Federal Rules of Appellate Procedure] . . . ." (quoting *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017))); *e.g.*, *Asilonu v. Asilonu*, 550 F. Supp. 3d 282, 301 (M.D.N.C. 2021) (affording self-represented litigant a "liberal construction of h[er] pleadings" but denying litigant's attempt to amend her counterclaim through her response to a motion to dismiss).

on *Faretta* in holding that criminal defendant failed to preserve issue under Rule 5:25); *Townes*, 234 Va. at 319 (citing *Church* and *Faretta* for the same). This is unsurprising considering that Virginia courts have consistently held that "regard is given to substance rather than form" when analyzing pleadings. *Pittman v. Pittman*, 208 Va. 476, 478 (1968); *see also Gologanoff v. Gologanoff*, 6 Va. App. 340, 348 (1988) (requiring only "substantial compliance" with statutory pleading requirements because "[t]o hold otherwise would be to put form over substance"). And, although the Virginia Rules do not contain a direct Federal Rule 8(e) analog, our Rules similarly bend in favor of "do[ing] justice." *See, e.g.*, Rule 1:8 (allowing for liberal amendment to "any pleading" "in furtherance of the ends of justice"); Rule 5A:18 (establishing "ends of justice" exception to requirement that appellate issues be preserved at trial level). In sum, our Supreme Court has never implied that *Faretta*/*Church* governs how we interpret self-represented pleadings, and it is likely that, consistent with the United States Supreme Court, Virginia courts should interpret such pleadings liberally.[22]

I emphasize again that, in this case, neither counsel for Green nor amici argued that Green's assignments of error should be liberally construed,[23] therefore the proper standard for interpreting self-represented litigant pleadings was not an issue before the Court. As I noted

---

[22] To be sure, although self-represented litigants are entitled to a forgiving reading in federal court, "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Garrett v. Selby, Connor, Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005); *cf. Wilson v. Astrue*, 249 Fed. App'x 1, 5 (10th Cir. 2007) (refusing to liberally construe self-represented brief that stated merely "go over the case from the begin[ning] to end. Thank you 'Back Pay'"). In this case, Green has gone far and above in constructing her own legal arguments, diligently arguing her case, and providing clear record citations to support her assignments of error. Courts have accepted far less. *E.g.*, *Parkell*, 833 F.3d at 324 n.6 (allowing claim to proceed after litigant retained counsel even though it "was not clearly pled or argued while [litigant] was pro se").

[23] This is perhaps understandable in light of the Court's prior order, discussed above. Although nothing in the order expressly limited counsel from advancing the argument that "standing" in this case, liberally construed, referred to PRA's failure of proof, counsel may have felt that such an argument was strategically unavailing.

above, however, it is abundantly clear that, when Green wrote her assignments of error while unrepresented, she intended for the word "standing" to refer to the merits of PRA's claim; thus, this case may have resulted in a different judgment had the parties sought a more forgiving construction. Additionally, given the increasing prevalence of cases like these involving debt buyers, I note that nothing under our Rules or caselaw seems to prevent a liberal construction of self-represented litigants' assignments of error in future cases that come before us.[24] But, because we were presented with only a legal theory attacking PRA's legal standing, I am compelled to join the Court's analysis today.

---

[24] To the extent that a liberal rule of construction would apply to interpreting trial-level pleadings, such a rule would logically extend to the interpretation of assignments of error in this Court. *See Whitt*, 61 Va. App. at 648 ("[A]n assignment of errors is in the nature of a pleading, . . . it performs the same office as a declaration or complaint in a court of original jurisdiction." (quoting *First Nat'l Bank of Richmond v. William R. Trigg Co.*, 106 Va. 327, 341 (1907))); *cf. Green*, 16 F.4th at 1074 ("We liberally construe pleadings *and* briefs submitted by pro se litigants . . . ." (emphasis added) (quoting *McLeod*, 864 F.3d at 156)).

Causey, J., with whom Chaney, J. joins, dissenting.

I respectfully dissent from the en banc majority opinion. PRA did not have standing to sue Ms. Mazie Green.

Binding Virginia precedent establishes when one can sue and collect on a debt. For any purported assignee to sue or collect on a debt, they must show sufficient relations with, dealings with, or interactions with the defendant. PRA has not shown any connection to Ms. Green nor her account with CIT Bank, and, therefore, has failed to show the proper connection to Ms. Green. PRA cannot and has not produced any evidence showing the transfer of Ms. Green's alleged CIT Bank account. In Virginia, the burden rests on PRA to show that they have the right to sue Green. In other words, that PRA is the assignee of Green's account. Rather, PRA must provide documentation showing the chain of ownership of the sued-on account from the original creditor.

PRA is a debt buyer. Virginia has not adopted a definition of "debt buyer," we may rely on other jurisdictions' definitions as persuasive authority. *See Thorne v. Commonwealth*, 66 Va. App. 248, 255 (2016) (relying on out-of-state cases as persuasive authority). A debt buyer is a person or entity that engages in the business of purchasing charged-off consumer debt ("charge-off means the act of a creditor that treats an account receivable or other debt as a loss or expense because payment is unlikely," Md. Rule 3-306) for collection purposes, whether it collects the debt itself, hires a third party for collection, or hires an attorney-at-law for collection litigation. Cal. Civ. § 1788.50.

In 2022, when Green appealed the judgment against her, she argued that PRA had failed to prove its ownership of her account. Green's *pro se* appeal demonstrated that PRA had sued her without account-specific proof of the debt's chain of title, and thus failed to show ownership of the account. A panel of this Court agreed that PRA had failed to prove its assignment and,

- 33 -

thus, lacked standing to sue and failed to prove its case. And it held that the circuit court had erred by failing to permit her to be heard on her Fair Debt Collection Practices Act counterclaim.

I wholeheartedly disagree with the approach that the en banc majority has taken to this case. Rather than directly reviewing a *pro se* litigant's challenge to a debt buyer pegged as a "repeat offender" by our federal government, we have allowed technical and procedural matters to obfuscate the arguments. Meanwhile, Green has been strictly held to having written the word "standing" in her assignments of error, relegated to a deferential procedural posture for not writing "standing" in a different document, and denied the chance to have her FDCPA counterclaim heard because she allegedly wrote the wrong number on her appeal notice in the general district court. I disagree with these analyses, but either way, the truth is that we have always understood Green's argument, from the general district court to en banc, and nothing prevents us from interpreting *pro se* litigants' arguments liberally.

Even strictly construed as a challenge to standing, Green's argument should prevail. Standing is defined as "A party's right to make a legal claim or seek judicial enforcement of a duty or right based on the party's having a sufficient interest in a justiciable controversy." *Standing*, *Black's Law Dictionary* (12th ed. 2024). Our Supreme Court has said that "The concept of standing concerns itself with the characteristics of the person or entity who files suit." *Anders Larsen Tr. v. Bd. of Supervisors*, 301 Va. 116, 120 (2022) (quoting *Cupp v. Bd. of Supervisors*, 227 Va. 580, 589 (1984)). In assessing standing, "we ask, in essence, whether [the claimant] has a sufficient interest in the subject matter of the case so that the parties will be actual adversaries and the issues will be fully and faithfully developed," *Cupp*, 227 Va. at 589, or, in other words, "whether the claimant truly has 'a personal stake in the outcome of the controversy,'" *Morgan v. Bd. of Supervisors of Hanover Cnty.*, 302 Va. 46, 59 (2023) (quoting *McClary v. Jenkins*, 299 Va. 216, 221 (2020)). "The point of standing," our Supreme Court has

said, "is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case." *Cupp*, 227 Va. at 589. Here, PRA asserted a position without showing any legal right to do so.

A plaintiff must meet several requirements to have standing. For one, the injury alleged must be causally related ("fairly traceable") to the conduct of the person sued, rather than the actions of a third party. *See Mattaponi Indian Tribe v. Commonwealth*, 261 Va. 366, 376 (2001) ("[T]here [must] be a causal connection between the injury and the conduct complained of, that is, the injury must be fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the court . . . ."). So, here, PRA's alleged injury (not having been paid a debt) must be causally connected to an action taken by Green, not some other accountholder. PRA must have some causal connection (fairly traceable interactions/dealings) to an account of Green that is allegedly not paid in full. In other words, if PRA sued the wrong person, it lacks standing.

Additionally, to have standing, a plaintiff must have a "direct, immediate, pecuniary, and substantial interest in the decision" and allege "facts demonstrating a particularized harm . . . different from that suffered by the public generally." *Morgan*, 302 Va. at 59 (quoting *Anders Larsen Tr.*, 301 Va. at 121). In contract law cases, the "legal interest" in the decision that a plaintiff must possess to have standing belongs only to those who are party or privy to the contract sued on. *See Cemetery Consultants, Inc. v. Tidewater Funeral Dirs. Assocs.*, 219 Va. 1001, 1003 (1979) ("The general rule at common law is that an action on a contract must be brought in the name of the party in whom the legal interest is vested, and this legal interest is ordinarily vested only in the promisee or promisor; consequently, they or their privies are generally the only persons who can sue on the contract."); *Cottrell v. General Sys. Software Corp.*, 248 Va. 401, 403 (1994); *APAC-Virginia, Inc. v. Va. Dep't of Highways & Transp.*, 9

Va. App. 450, 452 (1990). So, here, for PRA to sue Green on her alleged CIT Bank account, it must have been assigned contractual rights to an account Green had with CIT Bank.

The "merits" of a case, on the other hand, are "The elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous and technical points, esp. of procedure . . . ." *Merits*, *Black's Law Dictionary*, *supra*. In a suit on a contract, the merits are not simply whether the plaintiff is party or privy to the contract, but whether there is "(1) A legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 344 (2016) (quoting *Ulloa v. QSP, Inc.*, 271 Va. 72, 79 (2006)). So, in addition to proving it was the right party to the case as a matter of standing, PRA had to prove the merits of its case by showing breach and damages.

When Green challenged PRA to prove its assignment—that it, PRA, was the assignee of her particular account—she made a classic standing argument: Prove who *you* are to *me*. PRA has shown no connection and has not done so, up to and including en banc. There was no evidence that the debt it allegedly owed was fairly traceable to Green, and it failed to show that it had a legal interest in the decision, as party or privy to the contract, because it failed to show or prove that it was the assignee of an account Green held with CIT Bank, the alleged, sued-on account.

The *Morgan* decision should not be read to bar our courts from assessing whether a plaintiff has proven that it is a proper party to the case as a matter of standing when that question has some overlap with the case in chief. *Morgan* should be read to state that standing is narrowly focused on a plaintiff's "personal stake in the outcome," and thus does not concern *other* issues

- 36 -

critical to winning in a lawsuit. Whether a plaintiff has proven that it is a party or privy to a sued-on contract is a quintessential "personal stake" standing question.

Our review here should not be confined to the summary judgment phase. As our Supreme Court noted in two 2022 decisions, standing can be challenged at any time during trial. *See Anders Larsen Tr.*, 301 Va. at 123 n.4; *Seymour v. Roanoke Cnty. Bd. of Supervisors,* 301 Va. 156, 166 n.3 (2022). And Green sufficiently preserved her standing objection at the end of trial. Significantly, the circuit court had jurisdiction over Green's FDCPA counterclaim, and should have permitted Green to argue.

Green's challenge to PRA's standing should prevail. The circuit court erred by granting judgment to PRA where its proof of assignment contained a gaping hole. A debt buyer must prove that it has acquired the account on which it has sued to have standing; it cannot do so when it has failed to provide evidence of the alleged sued-on account's transfer between at least four prior alleged owners. When a debt buyer, just like every other contractual party or assignee in the Commonwealth, sues to collect a debt, it must show that it is not a legal stranger to the contract on which it has sued—having "a direct, immediate, pecuniary, and substantial interest in the decision"—and that its alleged harm is "fairly traceable" to the actions of the defendant. *See Morgan*, 302 Va. at 59, 64 (first quoting *Anders Larsen Tr.*, 301 Va. at 121; and then quoting *Mattaponi Indian Tribe*, 261 Va. at 376). If, when challenged, it cannot prove chain of title,[25] it lacks standing.

## I: PRA's Lack of Standing

Green should prevail in her argument that the circuit erred in granting judgment against her because PRA lacked standing to sue her. PRA must show that it has some relationship with,

---

[25] Chain of title is admissible documentation establishing that the debt buyer is the owner of the specific debt at issue. The chain of title must be unbroken.

some dealings with, or some interaction with Green's alleged CIT Bank account. The question is not whether Green owes a debt, which goes to the merits of the case. Standing is about owning the account. Because PRA lacked evidence that it owned her alleged CIT Bank account, it lacked evidence that it had a "direct, immediate, pecuniary, and substantial interest in the decision" as a contractual "party or privy" to the account. *See Morgan*, 302 Va. at 59 (quoting *Anders Larsen Tr.*, 301 Va. at 121); *Cemetery Consultants*, 219 Va. at 1003. And it lacked evidence that the harm it alleged was fairly traceable to any action taken by Green. *See id.* (quoting *Mattaponi Indian Tribe*, 302 Va. at 64). It was plainly wrong[26] for the court to find that PRA had proved, by a preponderance of evidence, that it was the assignee of her account throughout and by the end of trial. PRA thus failed to prove standing.[27]

What does it mean to have standing to sue on an account? Clearly, the question is not whether an assignee is owed a debt on the merits. Standing is simply about owning the account. The merits of the case would also require PRA showing that the debt is remaining and unpaid, and showing, for instance, that PRA was not beyond the statute of limitations. Those are examples of what is required for the merits of a debt collection case. We do not have those things here. We simply have the standing question, which is whether PRA bought Green's

___

[26] This issue was not briefed, but it is worth noting that our review could be understood as a de novo standing review, or as assessing whether the trial court was "plainly wrong" in finding a fact on which standing depended. *See Platt v. Griffith*, 299 Va. 690, 692 (2021) (de novo review of standing); *Malbrough v. Commonwealth*, 275 Va. 163, 168 (2008) (we are "bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by the evidence . . ."). I assess the case in terms of the "plainly wrong" standard.

[27] The same reasons why PRA failed to prove standing are reasons why its failed to prove its case in chief. We should construe *pro se* documents broadly to convey the strongest arguments they suggest. *Infra* at 34. Green argued at trial and in her *pro se* brief that PRA failed to prove its assignment. So, Green should also prevail on appeal because PRA, in failing to prove assignment, also had insufficient evidence to prove its case in chief.

account that it sued on.  It is possible that the account was paid in full along the way of being sold—that issue goes to the merits of the case.

We must not get the two confused, as the majority has done.  The merits include whether the account was paid or unpaid, but standing is whether PRA owns the account to begin with. We know that PRA is a debt buyer that bought an account.  Here is where it gets muddy.  What account(s) did it buy and to whom, specifically, did the individual account belong?  The merits are not only whether PRA owns an account, but whether it owns an unpaid account.  At trial, the proof on the merits goes to whether this account is an unpaid account.  PRA has to prove that. Most account buyers do not have evidence that the account was unpaid.

We know PRA is an assignee; that is its characteristic.  But it has to show more than it is an assignee of a bunch of accounts; it must show that it is an assignee of Mazie Green's account, which gives it the right to recover from Mazie Green.  PRA must show some reason why it is suing this particular individual; it must show that it owns something that allows it to recover from *her*.  The en banc majority treats standing as if one looks only at the plaintiff, and does not consider the relationship between the plaintiff and the defendant.  This idea produces the outcome of randomly suing people.  I state that there must be more to standing than just the characteristics of the plaintiff, in a literal sense.  There must be some relationship with, dealings with, or interaction between the plaintiff and the alleged harm by the defendant.

### A.  Proving the Right to Collect a Debt

PRA asserts ownership—that it is the assignee—of Green's account through a series of assignments.  When pursuing an action on a contract or instrument assigned, an assignee "stands in the shoes" of the assignor, obtaining all the assignor's rights and remedies.  *Union Recovery Ltd. P'ship v. Horton*, 252 Va. 418, 423 (1996) (quoting *Mountain States Fin. Res. Corp. v. Agrawal*, 777 F. Supp. 1550, 1552 (W.D. Okla. 1991)).  Our Supreme Court has long held that a

party seeking to prove ownership of a contractual right by assignment bears the burden of proving that the assignment occurred. *See Tennent's Heirs v. Pattons*, 33 Va. (6 Leigh) 196, 207 (1835) (Carr, J.) ("The Pattons sue as assignees of their father: the answers call for proof of such assignment, and there is none in the record. . . . Yet this will not excuse the failure to file the proof when expressly called for.").

Although Virginia courts have not outlined precisely how to prove a legal assignment occurred, other courts have held that "there must be evidence of an intent to assign or transfer the whole or part of some specific thing, debt, or chose in action and the subject matter of the assignment must be described sufficiently to make it capable of being readily identified." 29 Williston on Contracts § 74:1 (4th ed. 2022) (collecting cases). And to recover a debt from a purported debtor, a party must prove that it owns the right to the specific debt at issue. *See Lewis's Ex'r v. Bacon's Legatee*, 13 Va. (3 Hen. & M.) 89, 114 (1808) (Fleming, J.). A debt buyer who alleges a right to a debt by assignment thus must trace the chain of its title to the specific debt it seeks to recover. The trace of the chain of title may not be broken. It must be continuous to establish the assignment.

A debt buyer (or any purported owner of the right to recover a debt) may introduce several forms of evidence to prove ownership of the specific account at issue. PRA sought recovery on breach of contract and account stated theories. For a debt based on a written contract, the best-evidence rule requires that "where the contents of a writing are desired to be proved, the writing itself must be produced or its absence sufficiently accounted for before other evidence of its contents can be admitted." *Brown v. Commonwealth*, 54 Va. App. 107, 115 (2009) (quoting *Bradshaw v. Commonwealth*, 16 Va. App. 374, 379 (1993)). If the original contract is unavailable, Code § 8.01-32 provides that a plaintiff may still bring suit on "any past-due lost . . . contract . . . or other written evidence of debt, provided the plaintiff verifies under

oath either in open court or by affidavit that said . . . contract . . . or other written evidence of debt has been lost or destroyed." For a debt based on an account stated, the plaintiff must prove that "the accounts between the parties have been either actually settled, or are presumed to be so from the circumstance of a party's retaining, for a long time, without objection, the account of the other party, which has been presented to him, showing a balance against him." *Ellison v. Weintrob*, 139 Va. 29, 35 (1924) (quoting *Watson v. Lyle's Adm'r*, 31 Va. (4 Leigh) 236, 249 (1833)). Relevant evidence for an account stated includes documentation or sworn testimony that a balance is final and definite and that the plaintiff sent account statements received by the defendant without the defendant's objection within a reasonable time. *See id.* at 31, 35-36; *Radford v. Fowlkes*, 85 Va. 820, 852 (1889).

A debt buyer must then introduce evidence to prove that it has been assigned that original contract or account between creditor and debtor. For debt buyers, available documentation typically includes the purchase and sale agreements between each assignor and assignee in the chain of title, along with files listing information on the specific accounts transferred from assignor to assignee. *See New Century Fin. Servs., Inc. v. Oughla*, 98 A.3d 583, 591 (N.J. Super. Ct. App. Div. 2014). Under Virginia Rules of Evidence 2:803(6) and 2:902(6), a debt buyer can produce a live witness or affidavit of a custodian of record if the testimony or certification can show that someone with personal knowledge produced a reliable record of the debt and its transfer in the ordinary course of business. And the debt buyer can present live witness testimony about the ownership of the debt more generally, so long as "evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Va. R. Evid. 2:602.

Again, whatever admissible evidence the plaintiff chooses to present must meet its burden of proof to show it owns the specific debt at issue. *See Lewis's Ex'r*, 13 Va. (3 Hen. &

M.) at 114.  Whoever is trying to collect on an account has the burden of showing that they are the owners of the account and have an expressed or apparent authority to receive such payment. *Lambert v. Barker*, 232 Va. 21, 25 (1986).  To trace a series of assignments back to the original creditor-debtor contract and prove the plaintiff owns the defendant's debt, evidence of each assignment must contain, at minimum, the debtor's name and account number associated with the debt.

### B.  PRA's Failure to Prove Ownership of the Account

PRA must show ownership of the account.  PRA has never shown ownership of the account.  This should be a simple showing.  Similar to the showing that you have a valid driver's license, you should be able to show you have a valid right to collect on an account as an assignee.  PRA could not, and made many excuses for not showing ownership, including that it was confidential to do so.

Sadly, the en banc majority sets a poor precedent that fails to meet century-old standards. PRA has not provided proof of transfer or ownership.  There is no proof of the assignment in the record.  The record contains mismatched account numbers, bills of sales without attachments, and no account of Green that is due and owning.  Additionally, no witness with personal knowledge could attest to any of the transfers.  Courts must and should base their decisions on clear evidence, avoiding overreaching and unwarranted speculation.

PRA's witnesses admitted that the account was not identifiable in the documentary evidence it provided.  PRA stated that the account was listed on a random spreadsheet of numbers.  Due to confidentiality, it said, that was all it could show to the court or to Green.  This is unacceptable.  Readily identifiable account information only requires showing one account in this case.  The other account numbers could be easily redacted. Green was hauled into court and

was told she could not be shown proof as to why. The majority has set this as the prevailing standard of standing.

This case's facts are analogous to *Green v. Ashby*, 33 Va. (6 Leigh) 135 (1835). In *Ashby*, the trial court found that the plaintiff, who alleged he had been assigned the right to payment of a judgment debt against the debtor, could recover from the defendant, who was the purported assignor's attorney and had been paid the judgment debt. *Id.* at 135. The plaintiff presented the following evidence that a purported assignor had assigned him the right to collect: bills for fees that the purported assignor owed the plaintiff; a "mutilated paper, of which no sense c[ould] be made" which the plaintiff testified was authority to prosecute and recover the judgment from the debtor; and testimony from a witness who said the plaintiff had told him the plaintiff had an interest in the claim, but that he "never saw any assignment." *Id.* at 144 (Carr, J.). Our Supreme Court reversed. Justice Carr found that even "allowing [the evidence] the utmost weight that in fairness can be claimed for it, it proves no transfer of th[e] debt . . . from [the purported assignor] to the [purported assignee]." *Id.* While the assignee said the debt was his, "surely, this, without assent or even knowledge of the claim by [the assignor], could prove nothing." *Id.* The scant evidence could not "create that privity which is necessary to support an action" by the plaintiff against the defendant. *Id.* at 145. Consequently, there is no evidence here that could create privity of the parties to support an action by PRA against Green. Given the utmost weight PRA proves no transfer of the account (debt).

As in *Ashby*, to prove it had been assigned Green's debt, PRA introduced several pieces of documentary evidence along with testimony supporting those documents. And, as in *Ashby*, PRA needed more evidence to meet its burden to prove it owned the right to recover on Green's specific account.

In other words, who owes the account (debt) and who legally can collect the debt must be stated clearly in the documentary evidence. Random spreadsheets with numbers do not meet the burden to prove who owns the right to recover an account (debt). A bill of sale must contain all the information and attachments to authenticate the account (debt). At a minimum, the bill of sale must identify the debtor and the amount of debt owed. The debt cannot be authenticated if there is no information in the bill of sale that identifies the person or company regarding the details of the account (debt). First, the documents PRA produced include no evidence that Green's account traced back from PRA to CIT Bank. PRA sought to trace its ownership of Green's debt back to CIT Bank through four bills of sale: from CIT Bank to WebBank in September 2010, from WebBank to Comenity Capital Bank in August 2013, from Comenity Capital Bank to Synchrony Bank in July 2018, and from Synchrony Bank to PRA in June 2019. The first three bills of sale are one-page documents that mention only "accounts" or "assets" transferred between the companies; no attachments are mentioned in the bills of sale, and no documents introduced to the record list the specific account numbers transferred in each sale. The final bill of sale from Synchrony Bank to PRA mentions "the Accounts as set forth in the Notification Files," but PRA did not produce the "notification files." PRA did produce a two-column spreadsheet with data for an account number ending in 7068 with Green's name, but the spreadsheet lacked a date, creditor name, and any means of tying the spreadsheet to a specific bill of sale or otherwise identifying the source or purpose of the document.[28] It also produced a Synchrony Bank "pricing information addendum" for an account ending in 7068, which PRA

---

[28] PRA argues it could not produce further documentation of the accounts sold because doing so would result in other customers' confidential account information being included. We agree that other customers' confidential account information has no relevance and should not be produced. But PRA's argument neither explains why a spreadsheet or other documentation could not be produced for each bill of sale for Green's account specifically, nor why the spreadsheet produced includes no headings or other information that tie it back to a specific bill of sale.

points to on brief as the "underlying PayPal account agreement," but the addendum lacked Green's name, signature, and the date of the agreement.[29] And the monthly PayPal billing statements from July 2017 through September 2018 listing customer name Mazie Green list a different account number ending in 8616 and fail to cover the first 7 years of the alleged account's history. We find this jumble of documents, without more, akin to the mutilated paper in Ashby that purported to show the plaintiff had been assigned the account it sought to recover on.

With the documents unable to support chain of title or even the existence of the initial agreement, that leaves the affidavits and testimony through which PRA sought to tie the documents together. PRA introduced as a trial exhibit an affidavit signed and dated November 16, 2021—the day before trial—by Castillo, "[s]enior [m]edia [a]ffidavit [r]epresentative" at Synchrony Bank. Castillo attested that, based on his review of Synchrony Bank's records, Green was issued a credit card account ending in 8616 on September 16, 2018, that account was changed to a number ending in 7068 on June 24, 2019, and the account was sold to PRA on June 27, 2019.[30] Castillo's statement, which relayed what he had learned from reading documents not

---

[29] In addition to being evidence that PRA did not own Green's account, we note that this could also be evidence that PRA failed to produce an underlying contract or agreement. *See Brown*, 54 Va. App. at 115; *Bradshaw*, 16 Va. App. at 379. Code § 8.01-32 outlines the procedures for lost written evidence of a debt, but the record does not include evidence that PRA "verifie[d] under oath either in open court or by affidavit that said . . . contract . . . or other written evidence of debt has been lost or destroyed." That said, Green did not assign error to the trial court on this point.

[30] This document was not available at the summary judgment stage. Therefore, at that stage, PRA had provided *no* evidence that attempted to explain why the account it was suing on had the wrong ending account number. Thus, while I disagree that this case should be reviewed at the summary judgment phase, Green should have won on summary judgment. To create a "genuine dispute," PRA had to do something more to suggest it could connect the dots. No evidence, even viewed in the light most favorably to PRA, permitted a factfinder to infer the fact that a CIT Bank account had been assigned, or infer why the account PRA was suing on had the wrong account number. *See Klaiber v. Freemason Assocs.*, 266 Va. 478, 484 (2003) ("forced" and "strained" inferences will not defeat summary judgment).

in the record, was a statement not based on personal knowledge, and therefore not entitled to weight under the Virginia rules. *See Bowman v. Commonwealth*, 28 Va. App. 204, 210-11 (1998) (Executor of estate did not have "personal knowledge," and his statements were hearsay, when his testimony that a decedent's account had been closed was based on his review of bank statements not in evidence.); Va. R. Evid. 2:602 (personal knowledge requirement). PRA also presented Stacy, a PRA custodian of records, as a trial witness. Stacy testified that the two-column spreadsheet with account number ending 7068 was produced near the time of the sale from Synchrony to PRA.[31] She did not testify that Green's specific name and account number were part of each assignment in the alleged chain of title—which, of course, she could not, because as custodian of records at PRA, she could at most have personal knowledge, required by Rules 2:602 and 2:803(6), of the transaction between Synchrony Bank and PRA. She testified only that, for each of the four bills of sale, the transfer agreement that would presumably list the specific account numbers transferred could not be produced because "they contained the names and account numbers of others" and were thus "confidential." On balance, in the light most favorable to PRA, Castillo's affidavit and Stacy's testimony show only that the Synchrony information for an account ending in 8616 in Green's name was changed to one ending in 7068 just before sale, and that account was sold to PRA. Castillo and Stacy said nothing from which the circuit court could conclude that the chain of title for an account in Green's name passed from CIT Bank to WebBank, WebBank to Comenity Capital Bank, or Comenity Capital Bank to Synchrony Bank. For those first three assignments, as in *Ashby*, testimony purporting to tie the

---

[31] Stacy also testified on cross-examination that the account number on the PayPal credit billing statements ended in 8616, and when asked by Green "if the account ending number of 7068 was the same as the account ending number 8616," Stacy said, "no." This response could reasonably be interpreted as an admission that the two accounts were different. But viewing the facts in the light most favorable to PRA, we assume Stacy was making the equally reasonable observation that 7068 and 8616 are two different numbers.

documents to the chain of assignments showed no knowledge of the assignment. Thus, without proof of ownership, PRA lacked standing to sue Green.

O'Toole's affidavit states that PRA owned Green's account "based upon a review of the business records of the Original Creditor CIT BANK/PAYPAL and those records transferred to [PRA] from SYNCHRONY BANK . . . , which have become a part of and have integrated into [PRA]'s business records, in the ordinary course of business." But O'Toole, as custodian of records at PRA, could not have had personal knowledge of the business practices of Synchrony, Comenity Capital Bank, WebBank, or CIT Bank. And his statement about PRA's ownership of a debt (account) owed by a "Mazie Green," based on his review of records not in evidence, was a statement for which O'Toole lacked personal knowledge. *See Bowman*, 28 Va. App. at 210-11 ("The information upon which [the witness] relied to make his statement that the account was closed was information supplied by others and was hearsay."). Thus, without more evidence that Green's account number was included in each transfer along the alleged chain of title, the circuit court was plainly wrong to find that PRA proved ownership of Green's account. O'Toole's testimony is unsupported by any documentary evidence or other testimony. And even accepting, in the light most favorable to PRA, that Castillo's affidavit and Stacy's testimony established that the accounts ending in 8616 and in 7068 were the same, no evidence links either account number back to CIT Bank, WebBank, or Comenity Capital Bank.

The same conclusion follows when compared with the debt validation requirements of the Federal Debt Collection Practices Act. The Federal Debt Collection Practices Act[32] sets forth

---

[32] Additionally, in determining the amount of liability under the FDCPA in an individual action, courts are required to consider the following factors: the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional. 15 U.S.C. § 1692k. PRA has a history of violating FDCPA, which is a factor this Court "shall consider" in determining its liability. *See* 15 U.S.C. § 1692k(b); *see also Wiley v. Portfolio Recovery Assocs., LLC*, 594 F. Supp. 3d 1127 (D. Minn.

specific requirements for proving ownership of a consumer's debt: the requirement of "validation." The FDCPA requires debt collectors to validate consumers' debts within five days of the initial communication[33] with a consumer. 15 U.S.C. § 1692g(a). The validation information must be clear and conspicuous. Per 15 U.S.C. § 1692g(a), a debt collector must provide the following information to validate a debt:

> (1) the amount of the debt;

> (2) the name of the creditor to whom the debt is owed;

> (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

> (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

> (5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

Once the validation information is provided, the consumer has 30 days to dispute the validity of the debt and/or request the information about the original creditor. 15 U.S.C. § 1692g(b). "If the consumer notifies the debt collector" within this thirty-day period, the debt collector must:

> cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a

---

2022); *Pantoja v. Portfolio Recovery Assocs., LLC*, 852 F.3d 679 (7th Cir. 2017); *Bowse v. Portfolio Recovery Assocs., LLC*, 218 F. Supp. 3d 745 (N.D. Ill. 2016); *Litt v. Portfolio Recovery Assocs., LLC*, 146 F. Supp. 3d 857 (E.D. Mich. 2015).

[33] A formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a). 15 U.S.C. § 1692g(d).

> judgment, or the name and address of the original creditor, and a
> copy of such verification or judgment, or name and address of the
> original creditor, is mailed to the consumer by the debt collector.

*Id.*

Here, Green repeatedly asked that her debt be validated by PRA and it was not. The debt is required to be validated prior to the legal proceeding, but even if this Court considers Stacy's testimony at trial, PRA still did not provide the proper information to validate the debt. At trial, Stacy testified that (i) none of the bills of sale listed Green's name or account number, (ii) the data sheet listing an account number ending in 7068 included with the bill of particulars lacked the creditor's name, and (iii) the account number on the PayPal credit billing statement ended in 8616 was not the same account as the account ending number of 7068. PRA largely bases its sufficiency argument on inadequate spreadsheets and testimony that fails to verify that the debt was owed by Green. Additionally, at oral argument, both Green and PRA were asked if the debt was validated and neither party could point to any evidence to answer that question affirmatively.

PRA asks this Court to draw an inference, based on the circuit court's statement of facts, Castillo's affidavit, and Stacy's testimony at trial, that PRA established that the debt belonged to Green. However, none of these pieces of evidence, considered individually or collectively, are enough to satisfy PRA's burden of verifying or validating the debt, and the circuit court was plainly wrong in determining that the debt was valid. Verifying and validating a debt are critical parts of the debt collection process that ensures fairness in debt collections.

Other jurisdictions have reached the same conclusion when debt buyers present similar evidence of ownership of a debt as what PRA presented here. The Ohio Court of Appeals reversed a trial court finding that the plaintiff debt buyer owned a debt through two assignments, holding that even if an affiant could properly authenticate "an uncertified Bill of Sale and an unconnected sheet of paper consisting of a single entry which purported to show the specific note

- 49 -

was transferred from [the intermediate assignee] to [the plaintiff]," the plaintiff would still need to produce documentation for each account "referenc[ing] the specific account number of the debtor's account." *Premier Cap., LLC v. Baker*, 972 N.E.2d 1125, 1133, 1134 (Ohio Ct. App. 2012). The Wisconsin Court of Appeals similarly found that, for a debt allegedly assigned three times, bills of sale that "did not specifically reference any individual accounts or debts" or include any referenced attachments were not "evidence indicating that [the plaintiff] own[ed] [the defendant's] specific debt." *Gemini Cap. Grp., LLC v. Jones*, 904 N.W.2d 131, 136-38 (Wis. Ct. App. 2017) (also finding that "nothing in [the plaintiff's custodian of records'] affidavit reasonably implies that [the custodian] would have had personal knowledge of the prior assignments of [the defendant's] debt); *see also Wirth v. Cach, LLC*, 685 S.E.2d 433, 435 (Ga. Ct. App. 2009) (reversing the trial court finding that the debt buyer owned the defendant's debt because the affidavit of the plaintiff's custodian of records "fail[ed] to refer to or attach any written agreements which could complete the chain of assignment from [the original creditor] to [the plaintiff]" and there was "no contract or [appendix] appended to the Bill of Sale which identifie[d] [the defendant]'s account number as one of the accounts [the original creditor] assigned to [the plaintiff]"); *Kenny v. Portfolio Recovery Assocs., LLC*, 464 S.W.3d 29, 34 (Tex. App. 2015) (finding no evidence of ownership of debt where bills of sale offered to prove assignments "d[id] not identify which accounts were transferred" and instead "identifi[ed] another document that contains the information" that "[was] not a part of the record"). In sum, a plaintiff who asserts ownership of a debt by assignment must produce evidence, for each and every assignment, showing the chain of title for the debt passed from the original assignor to the plaintiff. At minimum, such evidence must show that the defendant's account number, along with other relevant identifying information, was included in the assignment (e.g., an attachment to a bill of sale listing account numbers and other identifying information that traces back to the

bill of sale by affidavit).  If the claim is based on a written contract, the plaintiff must produce evidence that the defendant signed and dated that agreement, or otherwise follow the lost document affidavit procedures at Code § 8.01-32.  If documentary evidence is unavailable for a given assignment, the plaintiff must produce, by witness testimony or an affidavit, evidence from a custodian of record or other qualified individual with personal knowledge that the defendant's specific account was assigned.  *See* Va. R. Evid. 2:602; 2:803(6); 2:902(6).

Even viewed in the light most favorable to PRA, the scanty and incomplete evidence in the record cannot prove that PRA owns Green's debt (account) through a chain of title tracing back to CIT Bank.  The circuit court was plainly wrong in finding otherwise.

II: The Circuit Court Erred by Failing to Consider Green's Counterclaim

I also dissent from the en banc majority's holding that the circuit court lacked jurisdiction to hear Green's counterclaim.  It is not our role to scour the general district court record.  We must take the circuit court record as the record.  *See Barnes v. Newport News*, 9 Va. App. 466, 468-69 (1990) ("One purpose for a de novo appeal from a court not of record is the assurance of the right to a jury trial; however, the de novo appeal serves other functions as well.  A true appellate review must be based on the record made in the trial court.").  The en banc majority has simply based its holding here on its review of the general district court record.

A statement of facts that has been signed by the judge becomes part of the record.  *See* Rule 5A:8(c)-(d).  Here, the certified statement of facts states that the court never ruled on Green's motion to amend her grounds of defense to include her counterclaim, and contains no mention of evidence presented or argument on the counterclaim.  Additionally, a circuit court speaks through its orders.  *See Va. Fuel Corp. v. Lambert Coal. Co.*, 291 Va. 89, 107 (2016).  Here, the circuit court order states that Green's counterclaim "fails."  Thus, from the order, the

circuit court did have jurisdiction over Green's claim and ruled on it, but from the record, the court did not permit Green to present argument on it.

However, because the en banc majority emphasized and belabored this point during oral argument and in the opinion, I must address the general district court issue. The record shows that the counterclaim was part of the original case, not a separate case. The G.D.C. record shows that Green asserted her counterclaim as part of her grounds of defense to G.D.C. Case No. # GV20000670-00, and attached, as Exhibit 3, a memorandum detailing her counterclaim, also labeled with the same case number. PRA filed a response to Green's counterclaim and marked it with the same record number, GV20000670-00. The G.D.C. then told Green that she would need to file a warrant in debt in order for her counterclaim to be heard. Green filed that warrant in debt, and the warrant in debt was marked with a different case number. After PRA's trial, the G.D.C. gave Green her money back on the warrant in debt, noting that she "did not have to pay for counterclaim filed." Green's counterclaim in her grounds of defense nor PRA's response to the grounds of defense was never withdrawn. Evidently, the G.D.C. realized that Green was not required to file a warrant in debt for her counterclaim to be heard. Thus, the warrant in debt marked with a different case number was a nullity. The G.D.C. never dismissed Green's counterclaim; it remained with the main case, the one that Green specifically appealed to the circuit court, filed in and with her grounds of defense. It is unclear why the majority has focused on this point as an excuse to dismiss her counterclaim.

Virginia's law of appeals to circuit court is broad enough to grant the circuit court jurisdiction. In 2020, prior to Green's assertion of her counterclaim, the General Assembly amended the law governing appeals of G.D.C. orders and judgments to the circuit court, Code § 16.1-106(B), to officially permit the automatic "piggyback" appeal of judgments on counterclaims asserted in the case. *See* 1 Friend's *Virginia Pleading and Practice* § 9.01 ("[I]n

2020 the General Assembly has provided that when any party appeals any portion of the case as pled in the general district court to the circuit court for review, that step brings the entire action before the [circuit] court, *including any counterclaims* that may have been pled in general district court." (emphasis added)). While the statute creating this right only literally mentions automatic appeal for *other* parties subject to related orders in the same case, the legislative intent of the rule is clearly to permit de novo circuit court review on all related matters on which a G.D.C. has entered judgment. *See id.* The circuit court had jurisdiction over Green's counterclaim and erred by ruling on it without permitting her to present argument. The circuit court should have heard Green's arguments that PRA had violated the FDCPA by "not reviewing their business records or ones they have been allegedly assigned," "robo-signing" an affidavit, and by attaching "a deceptive, misleading, and undated letter" to the warrant in debt.

### III: Proof of Standing and the *Morgan* Decision

While the en banc majority does not dispute the debt collector's burden to prove each link in an alleged chain of assignments,[34] nor our settled law that a plaintiff's status as a party or privy to a contract on which it has sued is a question of standing,[35] this Court finds that PRA had standing pursuant to its interpretation of our Supreme Court's recent opinion, *Morgan v. Board of Supervisors of Hanover County*, 302 Va. 46 (2023). The majority's interpretation of *Morgan* would require a new, constrained approach to the standing question that is unjustified. First, standing is a robust doctrine that often requires an assessment of proof, even on issues overlapping with the case in chief; second, the *Morgan* opinion does not require a reversal of this

---

[34] *See Ashby*, 33 Va. (6 Leigh) 135.

[35] *See Cemetery Consultants*, 219 Va. at 1003; *APAC-Virginia*, 9 Va. App. at 452 (treating assignee status, per Code § 8.01-13, as a stand-in for "party or privy" status, under *Cemetery Consultants*); *see ante* at 9-10 ("PRA's standing . . . turned on its claim that it was the assignee of the debt and that Green was a party to the contract by which the debt arose.").

approach; third, dicta in two 2022 Supreme Court opinions is supportive of this approach. Finally, *Morgan* is not only not harmful to Green's case, but helpful to it.

A. Virginia Courts and Proof of Standing

The standing doctrine provides defendants with important protection. It concerns "whether the claimant truly has 'a personal stake in the outcome of the controversy.'" *Morgan*, 302 Va. at 59 (quoting *McClary v. Jenkins*, 299 Va. 216, 221 (2020)). The plaintiff's "personal stake" must consist of a "direct, immediate, pecuniary, and substantial interest in the decision," and the plaintiff must allege "facts demonstrating a particularized harm . . . different from that suffered by the public generally." *Id.* (quoting *Anders Larsen Tr.*, 301 Va. at 121). Standing also requires that a plaintiff be able to trace the harm it alleges to the defendant. *See id.* at 65 (quoting *Mattaponi Indian Tribe*, 261 Va. at 376) (a "fairly traceable" harm). Overall, "[t]he point of standing is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case." *Anders Larsen Tr.*, 301 Va. at 120 (quoting *Cupp*, 227 Va. at 589).

We have adopted the principle that "[a]s a general rule, the party seeking relief 'bears the burden of showing that he has standing for each type of relief sought.'" *Damon v. York*, 54 Va. App. 544, 552 (2009) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). Accordingly, analyses of plaintiffs' *proof* of standing are far from alien to our courts. *See, e.g.*, *id.* at 552-57; *Kelley v. Griffin*, 252 Va. 26, 28-29 (1996); *Wilkins v. West*, 264 Va. 447, 458-60 (2002). To be sure, standing is often challenged with a demurrer. *See, e.g.*, *Morgan*, 302 Va. at 59. But nothing about standing is incompatible with matters of proof. The majority cites no case when our courts have ever declined to assess a post-pleadings challenge to proof of standing.

Our contract law standing cases demonstrate that our courts assess proof of standing even when the same matter could have, alternatively, been challenged as a plaintiff's failure to prove

its case in chief. It is settled law that only contractual parties and their privies have standing to sue on a contract. *See Cemetery Consultants*, 219 Va. at 1003 ("The general rule at common law is that an action on a contract must be brought in the name of the party in whom the legal interest is vested, and this legal interest is ordinarily vested only in the promisee or promisor; consequently, they or their privies are generally the only persons who can sue on the contract."); *Cottrell,* 248 Va. at 403; *APAC-Virginia*, 9 Va. App. at 452. Of course, proving that status is also necessary to prevail in the case in chief.

Nonetheless, our Supreme Court has conducted multiple party-or-privy standing analyses by assessing plaintiffs' proof. *See Cemetery Consultants*, 219 Va. at 1002-03 (plaintiff did "not have standing to maintain [the] suit" because at the ore tenus hearing, "there was no evidence offered which established . . . privity of contract . . . ); *Kelley*, 252 Va. at 28-29 (plaintiff lacked standing because he "was a stranger to the contract, and there [wa]s no evidence [at the ore tenus hearing] that the parties considered or even knew about [the plaintiff] when the contract was executed"); *Cottrell*, 248 Va. at 403 (judgment after trial reversed for standing because "the record is clear that General Systems, the plaintiff in this suit, is not a party to the contract of purchase"). These defendants could have argued the sufficiency of the evidence. But, like Green, they argued standing, and our Supreme Court reviewed their challenges directly.

Our contract law standing doctrine governs standing in debt collection cases.[36] Two 1830s Virginia Supreme Court debt collection cases show the same analysis in a debt collection context, using language that is the functional equivalent of the modern standing analysis. *See Pattons*, 33 Va. (6 Leigh) at 207 (Plaintiffs attempted to "sue as assignees of their father" but

---

[36] American Jurisprudence 2d, *Accounts and Accounting* § 7 (2016) ("An action on an account is an action based in contract. Thus, an action on an account must be founded on a contract, either express or implied.").

lacked "proof of assignment."); *Ashby*, 33 Va. (6 Leigh) at 145 (scant evidence of assignment did

not "create that privity which is necessary to support an action," and the plaintiff lacked any

"legal right . . . to call upon [the defendant] for the money").  Additionally, today, many states

evaluate debt collectors' failure to prove assignment as a standing question.[37]

---

[37] *See, e.g.*, *CACH, LLC v. Askew*, 358 S.W.3d 58, 62 (Mo. 2012) ("[E]very link in the chain between the party to which the debt was originally owed and the party trying to collect the debt must be proven by competent evidence in order to demonstrate standing."); *Unifund CCR Partners v. Zimmer*, 144 A.3d 1045, 1051 (Vt. 2016) ("Here, Unifund has failed to establish standing to pursue a claim of unjust enrichment against defendant because it cannot show that it suffered any injury fairly traceable to defendant.  Because Unifund provided no proof that it was connected to these transactions other than through the purported assignments, and because the assignments were not substantiated, there is nothing connecting Unifund to the charged-off account."); *Palisades Collection, L.L.C. v. Graubard*, 2009 N.J. Super. App. Div. Unpub. LEXIS 1025, at *3, *7 (Apr. 17, 2009) (per curiam) ("On appeal, defendant argues that the trial court incorrectly . . . determine[d] that plaintiff had the standing to prosecute this claim . . . .  We agree . . . .  Purged of this inadmissible material, plaintiff has not produced sufficient evidence to show it has the right to collect this claim from defendant."); *Pasadena Receivables, Inc. v. Parker*, No. 13-C-10-084673, at 6-7 (Md. Cir. Oct. 13, 2011) (mem. opinion) ("The question of whether the Appellant had standing to sue wholly depends on whether there was a valid assignment of the Appellee's debt to the Plaintiff.  Appellant bears the burden to establish by a preponderance of the evidence that a valid assignment has been made thereby establishing standing."); *United States Bank Nat'l Ass'n v. Cataldo*, 2014 Pa. Dist. & Cnty. Dec. LEXIS 18049, at *44 (Feb. 4, 2014) ("In Pennsylvania, a number of Courts have wrestled with the question of standing to seek a judgment on a credit card debt.  In those cases, the Courts have allowed a Defendant to challenge the collection complaint by challenging the validity or proof of the assignments."). *Accord Western Ethanol Co., LLC v. Midwest Renewable Energy, LLC*, 938 N.W.2d 329, 342 (Neb. 2020) (An alleged assignee of a judgment "can establish that he is the real party in interest and has standing to execute the judgment if he can prove by a preponderance of the evidence the existence of a written assignment of the . . . judgment."); *PNC Mortg. v. Romero*, 377 P.3d 461, 467 (N.M. Ct. App. 2016) ("It remains clear that a party seeking to prove standing must show that it had the right to enforce the note at the time it filed its complaint."); *Elsman v. HSBC Bank USA*, 182 So. 3d 770, 772 (Fla. Dist. Ct. App. 2015) ("At trial, HSBC attempted to prove its standing as a holder with additional evidence. . . .  HSBC's evidence failed to establish its status as the holder of the note at the time of filing the foreclosure complaint against Elsman, and thus failed to establish standing. . . .  Therefore, we reverse[.]"). *But see Cap. Prop. Mgmt. Corp. v. Nationwide Prop. & Cas. Ins. Co.*, 757 Fed. App'x 229, 232 n.1 (4th Cir. 2018) (noting that although the lower court "framed its analysis [of whether the plaintiff proved assignment] as [the plaintiff]'s failure to establish standing . . . , the proper inquiry is whether [the plaintiff] failed to state a claim for breach of contract"); *Nyankojo v. N. Star Cap. Acquisition*, 679 S.E.2d 57, 58, 61 (Ga. Ct. App. 2009) (holding that debt buyer lacking proof of assignment failed to establish the elements of its case, despite defendant framing question as one of standing).

## B. The Meaning of the Standing-Merits Distinction in *Morgan*

The Supreme Court's 2023 *Morgan* decision stated that standing "is a preliminary jurisdictional issue having no relation to the substantive merits of an action." 302 Va. at 58 (quoting *McClary*, 219 Va. at 221). In this statement, our Supreme Court clearly reaffirmed *some* kind of distinction between standing and the merits. My colleagues in the majority appear to read this distinction in a highly literal manner, reading "no relation to the substantive merits" to mean that there must be *no* conceptual overlap whatsoever between standing and the plaintiff's case in chief—and that if such overlap exists, the standing challenge must be ignored. I am not persuaded that *Morgan* states such a rule.

For one thing, the *Morgan* Court presented its distinction as the logical outgrowth of standing's narrow focus on the "personal stake in the outcome" question. This can be seen by its use of the phrase "[a]s such," omitted from the en banc majority's quotation, with which the *Morgan* Court prefaced the quoted clause on the standing-merits distinction. The full quote from *Morgan* reads, "As such, 'standing to maintain an action is a preliminary jurisdictional issue having no relation to the substantive merits of an action.'" 302 Va. at 58 (quoting *McClary*, 299 Va. at 221). The "such" in "[a]s such" is a pronoun that links the standing-merits distinction to the fact that "[t]he concept of standing concerns itself with the characteristics of the person or entity who files suit." *Id.* The *Morgan* Court proceeded to explain that these "personal characteristics" are the requirements of the "personal stake" inquiry, which are that a plaintiff have a "direct, immediate, pecuniary, and substantial interest in the decision" and to "allege facts demonstrating a particularized harm." *Id.* at 59 (quoting *Anders Larsen Tr.*, 301 Va. at 121). As we have seen, standing's focus on the presence of a viable legal interest can sometimes lead to a direct overlap with the facts that a plaintiff must prove to win. *See Cemetery Consultants*, 219 Va. at 1002-03; *Kelley*, 252 Va. at 28-29; *Cottrell*, 248 Va. at 403. It is hard to see how the

- 57 -

*Morgan* Court, aware of this dynamic, could have meant to suggest that standing's personal-stake focus implies a lack of conceptual overlap with the case in chief.

Second, the original source of *Morgan*'s quote on a standing-merits distinction was a case in which the court *did* inquire into the presence of a contractual right to sue as a matter of standing. In that case, *Andrews v. American Health & Life Insurance Co.*, 236 Va. 221, 226 n.2 (1988), the Supreme Court had no problem reviewing a defendant's argument that a plaintiff was not an assignee, lacked other contractual rights to sue, and therefore lacked standing. Though it is unclear at what stage of litigation the contract was argued over (the trial court invited *post*-trial memoranda on the question of standing), it should raise our concern that *this* was the source of the distinction now cited to decline to review a proof-of-assignment standing challenge.

*Morgan*'s standing-merits distinction must be read in accordance with another statement from *Morgan*: "As important as the standing doctrine is, it can be satisfied without the necessity of asserting a plausibly successful claim on the merits." *Morgan*, 302 Va. at 58 (citing *Anders Larsen Tr.*, 301 Va. at 120). This sentence does not state that shared territory must be banished from the standing inquiry; it merely states that having standing does not guarantee the success of a plaintiff's case. Understanding *Morgan*'s distinction this way harmonizes it with our contract jurisprudence and with the *Andrews* case in which it originated: Having standing will not *necessarily* mean that one is likely to win—for instance, a contractual party may have subpar proof of breach.

There are multiple other reasons why we should adopt this moderate reading of the *Morgan* opinion. The fact that *Morgan* was a demurrer-phase case makes it an unlikely source of a rule on whether a post-pleadings standing challenge can require providing proof. *See Robert & Bertha Robinson Fam., LLC v. Allen*, 295 Va. 130, 149-50 (2018) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the

case in which those expressions are used." (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399-400 (1821))). Similarly, we should hesitate to infer a rule that restricts our review of a plaintiff's "direct, immediate, substantial, and pecuniary interest" in the outcome—from a case in which that point was not at issue; in *Morgan*, no one disputed that the plaintiffs owned homes nearby. *See Morgan*, 302 Va. at 52, 59-60. And the *Morgan* Court's concern about standing makes sense in terms of the moderate reading. An "absurdity" would not result if in *certain occasional* cases, issues overlapping with the plaintiff's case in chief were resolved as standing questions. But it *would* create an absurdity to convert the standing analysis into an estimation of the plaintiff's *overall* likelihood of prevailing in the lawsuit—that situation would indeed take too many cases from the jury. In other words, while "[p]roof of a specific legal right . . . that is capable of being remedied by a court" is within the purview of a standing analysis, whether a right "*has been infringed*" is another question entirely—and subsuming it into the standing doctrine would indeed bring about an absurdity. *Morgan*, 302 Va. at 58-59.

Similarly, when the *Morgan* Court said courts must not "conflate the threshold standing inquiry with the merits of [a litigant's] claim," *id.* at 63 (quoting *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 312 (4th Cir. 2009)), it meant that questions outside the "personal stake" analysis should not be brought into the standing inquiry. The "conflat[ion]" the Court was discussing was the argument that plaintiffs lacked standing because they should have sued back in 1995. *Id.* at 62-63. It was *not* saying that timeliness is normally a personal-stake issue but, that if proof is required, it impermissibly overlaps with the case in chief—rather, it was saying that a statute-of-limitations-style challenge does not raise a "personal stake" issue. *See id.* at 63 ("Whether the homeowners have asserted timely claims does not turn on standing principles . . . .").

Finally, I address the *Morgan* Court's description of standing as a "preliminary . . . issue." *Id.* at 58 (quoting *McClary*, 299 Va. at 221). This word must describe a logical, not temporal,

- 59 -

preliminariness.  This rule was first stated by a Court that unflinchingly reviewed a standing determination reached at the *end* of a trial.  *See Andrews*, 236 Va. at 226.

The best reading of the *Morgan* Court's distinction between standing and the merits would not require ignoring late-stage contract law standing challenges.  What *Morgan* means is that the highly specific "personal stake" standing inquiry can be resolved in a plaintiff's favor without the plaintiff necessarily being likely to prove its case in chief—not that when standing and the case in chief share a question, that question must be banished from the standing inquiry.

### C.  The Virginia Supreme Court's 2022 Opinions

Two 2022 Virginia Supreme Court opinions lent support, in dicta, for the practice of assessing proof of standing, even when the issues overlap.  First, in *Anders Larsen Trust*, the Court stated that a plaintiff has a duty that is ongoing, throughout each stage of litigation, to prove standing.  After finding certain allegations of standing sufficient for the demurrer phase, the Court added a footnote with instructions for the circuit court:

> To the extent there is a factual contest concerning the allegations that purport to establish standing, the circuit court may hear evidence to resolve the factual dispute, either pre-trial or during the course of the trial.  If the court resolves the factual contest against the complaining party, the court must dismiss the case for lack of standing.

301 Va. at 123 n.4.

The Court's instructions were very clear: The defendants might continue to challenge facts on which the standing determination depended.  *Id.*  If they did so, the circuit court would "hear *evidence* to resolve" standing "during the course of" trial.  *Id*. (emphasis added).

Next, in *Seymour v. Roanoke County Board of Supervisors*, 301 Va. 156 (2022), the Court reaffirmed that while "[a] plaintiff can survive a demurrer with well-pleaded allegations of standing . . . *it cannot survive thereafter without proof of standing*."  *Id.* at 167 n.3 (emphasis added).  Then, the Court specified the amount and type of proof necessary:

- 60 -

> Because the constraints of the standing doctrine "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the *same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation*."

*Id.* (emphasis added) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). For the *Seymour* Court, the burden of proof for standing challenges mirrors that generally required at that stage of litigation.

Finally, *Seymour* quoted *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009), discussing the resolution of jurisdictional issues "inextricably intertwined" with the merits. It stated, "Nonetheless, when the 'jurisdictional facts and the facts central to the [underlying claim] are inextricably intertwined, the trial court should ordinarily assume jurisdiction and proceed to the intertwined merits issues.'" *Id.* (alteration in original) (quoting *Kerns*, 585 F.3d at 193). I disagree with the concurrence that this calls for the resolution of all overlapping questions as "merits" issues.

Permitting certain issues to proceed past a pleadings-stage challenge is minimally relevant to a court's approach to standing challenges at the end of a trial. In *Kerns*, the question was whether a plaintiff's case should be dismissed on jurisdictional grounds without the opportunity for further evidentiary development through discovery. *See* 585 F.3d at 191. *Kerns* held that such a claim required denying the motion to dismiss and offering the protections of discovery. *Id.* at 196. On the other hand, when a late-stage standing challenge is lodged, the most important "procedural safeguard" for the *Kerns* court has already been afforded to the plaintiff. *Id.* at 193. At that stage, the only question is whether to consider or ignore the standing challenge based on the proof before it. In *Seymour* and in *Morgan*, when this language was quoted, the Court was considering not how to respond to a challenge to standing lodged at the end of trial, but the consequences of sustaining a demurrer to a standing challenge.

Nothing in the *Kerns* opinion stated that the jurisdictional issues disappear permanently upon the issues being recognized as "intertwined." In the context of a footnote that began by recognizing that standing can be challenged at *any* time, with the "manner and degree of evidence required at the successive stages of litigation," 301 Va. at 167 n.3, the *Seymour* Court's inclusion of the *Kerns* standard is more reasonably read as an explanation for its decision not to dismiss the case on a demurrer—not the elimination of the possibility of a late-stage standing challenge.

D. The *Morgan* Decision, Ownership, and the Requirement of Traceability

*Morgan* does not only discuss a distinction between standing and the merits. *Morgan* emphasizes two aspects of the standing doctrine that are crucial to Green's argument. In *Morgan*, first, the plaintiffs were homeowners in Hanover County, within 1,200 feet of the proposed Wegmans facility. *Morgan*, 302 Va. at 52. This fact was undisputed, but absolutely crucial, to their standing in that case. *Id.* at 59 (The first requirement for standing in zoning cases is that "the complainant must own or occupy real property within or in close proximity to the property." (quoting *Anders Larsen Tr.*, 301 Va. at 121)). Similarly, here, PRA must show something that it owns (i.e., the account) is an account of the defendant. It could not do so.

Second, *Morgan* shows the importance of looking at the defendant, and the plaintiff's relationship with that defendant, for the standing inquiry. Otherwise, how does the court determine whether the claimant has a personal stake in the outcome of the controversy? There must be some tie-in, relationship, dealings, interactions that show that the plaintiff or claimant may have suffered some harm from or because of the defendant. True, *Morgan* says that standing concerns the plaintiff's personal characteristics. But that is not all it says about standing. *Morgan* also states that standing requires that the alleged harm be "fairly traceable" to the actions of the defendant. *Id.* at 64-65 (quoting *Mattaponi Indian Tribe,* 261 Va. at 376). And

its "personal stake" inquiry is about a personal stake in the *outcome* of the case—meaning that the plaintiff's standing inquiry requires looking at the relationship of the plaintiff to the defendant. *Morgan* is a good example of the Court not purely considering only the plaintiff's characteristics, divorced from the plaintiff's relationship with the defendant. The Court shows that you must look at the plaintiff and some relationship to the defendant. The *Morgan* plaintiffs had to show that they were landowners near enough to where the defendant was planning to put a distribution center to show that they were going to be harmed. The plaintiffs had to show more than that they were just landowners in Hanover County; they had to show that they were landowners close enough to where the defendant was going to put a distribution center, which was going to harm them. This is the relationship, the dealings, the tie-in, with the defendant. This is why the plaintiffs had standing to sue Wegmans. For example, the *Morgan* plaintiffs, assuming another distribution center was going up 10 to 20 miles away, probably would not have standing and could not sue defendants because they would not be affected. Here, PRA cannot only be an assignee or owner of some accounts that it obtained from *someone*—PRA must own an account of this defendant.

This is what the Court must do here to find standing for PRA. PRA must connect the alleged harmed back to the person it is suing. How could the person (Green) potentially harm you? This is not going to a question reserved for the merits. This is not saying Green owes money to PRA—that's for trial. Similarly, this is not saying that the *Morgan* landowners could prove that the zoning provision was invalid. Rather, this is about the connection between the plaintiff and the defendant. *Morgan* clearly shows that this is a question of standing; standing is not just who the plaintiff is; it is more. This relationship, and these dealings, require strict proof thereof.

IV: <u>The Procedural Posture of the Case</u>

PRA's evidence did not show an assignment of any individually identifiable CIT Bank account or any account connected to Green. One need not be aware of PRA's track record of suing to collect debts it was not owed[38] to spot the dangers of a suit predicated on such evidence. But the en banc majority reviews PRA's evidence in a summary judgment procedural posture, softening the question presented. The en banc Court should have engaged Green's arguments directly. Green preserved her challenge at the end of the case, and PRA should not have been permitted to bring a waiver argument for the first time en banc, after declining to make the argument before the panel.

A. Green's Preservation of Her Standing Argument

Green's written objections to the final order preserved her arguments. Under Rule 5A:18, an objection must be stated with "reasonable certainty" so that trial courts can "rule intelligently on [a] matter" before it is considered on appeal. *Hannah v. Commonwealth*, 303 Va. 106, 126 (2024). Green's written objections made her standing objection "reasonably certain."

In Green's written objections to the final order, Green provided a specific link to her summary judgment motion, writing, "Defendant asks that the Court retain her ability to appeal this decision, her motion for summary judgment and her right to stay judgment until after an appeal." Green also wrote, "Plaintiff has failed to provide the Court with the complete Bills of Sale specifying account ending number sued upon *to prove assignment.* None of the bills of sale included documents specifying Defendant's name or account ending numbers." (Emphasis added). Green had previously made the same substantive argument in her "Motion for Summary Judgment Plaintiff Lacks Standing," writing, "Plaintiff has (1) *no valid proof of assignment*, (2) no proof that the original account number ending in 7068 changed to account number ending in

---

[38] *See infra* § V.

8616, and (3) has no contract for Cit Bank account ending in 7068.  Plaintiff *lacks standing*."  (Emphasis added).  The same judge had ruled on this earlier motion.  The only difference was that Green, a *pro se* litigant, had omitted a legal term of art ("standing") in her written objections.

The judge should have known that Green was not altering her arguments in her written objections when they were substantively identical.  Even if a liberal reading of Green's objections were necessary to reach this conclusion, this should be permitted.[39]  "A document filed *pro se* is 'to be liberally construed . . . .'"  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  "[A] *pro se* complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers.'"  *Estelle*, 429 U.S. at 106 (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1952)).  "In practice, this liberal construction allows courts to recognize claims despite various formal deficiencies, such as incorrect labels or lack of cited legal authority."  *Wall v. Rasnick*, 42 F.4th 214, 218 (4th Cir. 2022).  *Pro se* pleadings should be "interpreted 'to raise the strongest arguments that they *suggest*.'"  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis added) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).  The "policy of liberally construing *pro se* submissions is driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances *to protect* pro se *litigants from inadvertent forfeiture of important rights* because of their lack of legal training.'"  *Id.* at 475 (alteration in original) (emphasis added) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

---

[39] The concurrence discusses self-represented litigants.  It is important to acknowledge the difference between self-represented and unrepresented litigants.  Litigants like Green, who lack legal training, are referred to as unrepresented litigants.

## B. PRA's Waiver of its Waiver Argument

The en banc Court should not have permitted PRA to argue that Green did not preserve her standing arguments at the end of trial because PRA omitted this argument before the panel. Knowing that Green's challenge concerned its trial evidence, PRA never suggested that the panel apply a summary judgment procedural posture[40]; it introduced the argument only in its second submission to the en banc court. The irony of the situation can be pinpointed: a wealthy corporation structures its case against a *pro se* alleged debtor on the admonition that being without an attorney is no excuse for failing to preserve her argument; the company itself omitted to make this waiver argument at the prior stage of litigation.

PRA's late amendment is not compatible with our en banc rehearing system. The Fifth Circuit has considered this question multiple times and held that arguments not made to the panel will not be addressed en banc. *See Lucio v. Lumpkin*, 987 F.3d 451, 478 (5th Cir. 2021) (quoting *Miller v. Tex. Tech Univ. Health Science Ctr.*, 421 F.3d 342, 349 (5th Cir. 2005)). Adopting this approach for represented litigants would permit a better use of this Court's resources and time. There is good reason to permit unrepresented litigants leeway,[41] but there is no reason not to require litigants like PRA to preserve their arguments for en banc review at the panel level, much as appellants must preserve their objections for three-judge panel review. Further, as PRA maintained to the panel that its trial witness solved its chain of title problems, its attempt to

---

[40] Green's *pro se* opening brief stated that she had preserved her standing argument in her objections to the draft final order. Green's brief critiqued the trial testimony of PRA's Custodian of Records, Lecinda Stacy. PRA's appellee's brief argued that the circuit court judge did, in fact, have sufficient evidence to make a "finding, by a preponderance of the evidence" for PRA. And PRA stated, in oral argument before the three-judge panel, that its nameless bills of sale could be linked to Green's account by the PRA custodian's trial testimony. PRA's short supplemental authority brief only suggested limits of the standing doctrine; so, neither the panel majority nor the dissent analyzed the case at the summary judgment phase.

[41] *But see Green v. Portfolio Recovery Assocs., LLC,* No. 0144-22-3 (Va. Ct. App. June 10, 2024) (order) (denying Green's request to amend her *pro se* assignments of error).

introduce, en banc, a procedural posture that would have us disregard this testimony appears to be an impermissible approbate/reprobate scenario. *See, e.g.*, *Nelson v. Commonwealth*, 71 Va. App. 397, 403 (2020).

V: <u>Access to Justice</u>

In many ways, the effects of the en banc majority decision will be confined to the case at bar. The majority does not lessen the debt collector's burden to prove, by a preponderance of the evidence, every step in a chain of title before it may prevail in a suit on an account or underlying contract. *See Pattons*, 33 Va. (6 Leigh) at 207; *Ashby*, 33 Va. (6 Leigh) at 135. The decision does not prevent ownership of a debt from being challenged on the grounds of standing—it acknowledges that it may be so challenged. *Ante* at 9-10. ("PRA's standing . . . turned on its claim that it was the assignee of the debt and that Green was a party to the contract by which the debt arose.").

Still, this case provides an opportunity to discuss the debt collection industry and the impacts of this industry on access to justice. The debt buying industry has exploded over the past twenty years. *See* Fed. Trade Comm'n, *The Structure and Practices of the Debt Buying Industry* 12-14 (2013)), https://perma.cc/FLV2-FTQ4 [hereinafter Structure and Practices]. The growth in this industry has inevitably led to litigation. Courts around the country have been compelled to confront their practices. Virginia courts have little precedent related to debt buying, so we rely on cases from other jurisdictions and secondary sources to provide a framework and backdrop to better understand the industry. *Thorne v. Commonwealth*, 66 Va. App. 248, 255 (2016) (relying on out-of-state cases as persuasive authority).

The debt-buying industry works in the following manner: first, a creditor and a consumer enter a contract by which the creditor (i.e., a bank) extends credit to the consumer—often through a credit card—in exchange for a promise to be repaid later. Structure and Practices,

- 67 -

*supra*, at 11, 13. When a consumer falls behind on repaying a creditor, the creditor often "charge[s] off" the debt as unrecoverable and sells the rights to recover the debt to a debt buyer who specializes in collecting delinquent debts. *Taylor v. First Resol. Inv. Corp.*, 72 N.E.3d 573, 578 (Ohio 2016); Consumer Fin. Prot. Bureau, *Fair Debt Collection Practices Act: CFPB Annual Report* 2013, at 9 (2013), https://files.consumerfinance.gov/f/201303_cfpb_March_FDCPA_Report1.pdf (last visited Dec. 16, 2024). The debts sold are usually "bundled" into portfolios of many accounts, which the debt buyer purchases at cents on the dollar compared to the face value of the collective debt owed. *Taylor*, 72 N.E.3d at 578; Structure and Practices, *supra*, at 7-8, app. D (study showing that between 2006 and 2009, the nine largest debt buyers—including PRA—collectively purchased consumer debt with face value of $143 billion for $6.5 billion). The debt buyer then either attempts to collect the debt or sells the debt to another debt buyer. Structure and Practices, *supra*, at 19. "Many debts are purchased and resold several times over the course of years before either the debtor pays the debt or the debt's owner determines that the debt can be neither collected nor sold." *Id.* at 1.

To be sure, debt buying has a role to play in the consumer lending industry. "Debt buying can reduce the losses that creditors incur in providing credit, thereby allowing creditors to provide more credit at lower prices." *Id.* But the business model depends on debt buyers using the legal process (or the threat of a lawsuit) to collect on enough of the many debts they have bought to generate a profit. *See Taylor*, 72 N.E.3d at 578. And that is when problems can arise.

In the course of a debt being sold several times, "documentation of information about the debt is often lost." *Id.* In a 2013 study, the Federal Trade Commission (FTC) found that while buyers receive some information about the debt they are purchasing, "[f]or most portfolios, buyers did not receive any documents at the time of purchase" and "[o]nly a small percentage of

portfolios included documents, such as account statements or the terms and conditions of credit."
Structure and Practices, *supra*, at ii-iii. Without adequate documentation, debt buyers can have trouble proving in court that they own the debts they seek to collect. Some debt buyers get around this by having employees sign affidavits for hundreds or thousands of debts per day, attesting personal knowledge of the facts of each case despite the impossibility of verifying the information for that many accounts that quickly (a practice called "robo-signing"). Peter A. Holland, *The One Hundred Billion Dollar Problem in Small Claims Court: Robo-Signing and Lack of Proof in Debt Buyer Cases*, 6 J. Bus. & Tech. L. 259, 268-69 (2011). But even for debt buyers acting in good faith, documentation is only a problem if the debt buyer is in fact forced to prove it owns a debt. "Empirical evidence shows that many debt buyers using a high volume of lawsuits as a component of their recovery strategy rely heavily on the assumption that consumers often fail to show up to contest the case," allowing debt buyers to win default judgments. *Taylor*, 72 N.E.3d at 578-79 (quoting Note, *Improving Relief from Abusive Debt Collection Practices*, 127 Harv. L. Rev. 1447, 1449 (2014)) [hereinafter Improving Relief]); *see also id.* at 578 (observing that the debt buying industry is "dependent in large part on the acquiescence, ambivalence, or ignorance of consumers"); *Brief of* Amici Curae *Legal Services of Northern Virginia*, et al. at 25 ("[O]f course, if a debt buyer wanted to pay more money for debt portfolios that contained the full evidence necessary to prove . . . alleged debts . . . the debt buyer could always choose to limit its purchases to those creditors selling such information; but this would also mean less potential profit.").

Lack of adequate documentation leads to mistakes. "A predictable result of debt buyers filing a high volume of lawsuits based on imperfect information is that lawsuits are regularly filed after the right to collect debts has expired or that seek to collect a debt that is not owed." *Taylor*, 72 N.E.3d at 579; *see also* Structure and Practices, *supra*, at i (because debt buyers "may

have insufficient or inaccurate information when they collect on debts," debt buyers can end up "seeking to recover from the wrong consumer or recover the wrong amount"). The FTC found that from 2006 to 2009, debt buyers "sought to collect about one million debts [per year] that consumers asserted they did not owe." Structure and Practices, *supra*, at iv. That rate of disputed debts alone "is a significant consumer protection concern" to the FTC. *Id.* at 39.

But the number of debts disputed likely understates the lack of information problem because consumers often do not challenge debts. *Id.* at 38. Ninety percent or more of consumers sued in debt collection actions do not appear in court to defend themselves, resulting in many default judgments. *Id.* at 45. Some consumers do not receive the validation notices that debt collectors are required to send before collecting on the debt; others "may not read or understand the validation notice because it does not identify the original creditor, they may assume it is junk mail, or they find writing a letter to be unduly burdensome." *Id.* at 38. And "many consumers may not respond due to a misunderstanding of the legal procedures required to avoid default." *Taylor*, 72 N.E.3d at 579 (quoting Improving Relief, *supra*, at 1449).

In Virginia, a helpful study conducted by amici curiae in support of Green in this case reveals that large debt collectors including PRA employ this same predatory business model in Virginia. Of the $30,610,707.37 in debts that PRA collected from Virginians from March 11, 2020 to March 11, 2024, 89.27% of its judgments were obtained by default. *See Brief of* Amici Curiae, *supra* at 36. By contrast, according to the data of a Virginia provider of free legal services, when alleged debtors appeared in court and received legal representation, the large debt buyers ultimately succeeded at trial in only 3.1% of cases in which alleged debtors obtained counsel.[42] *Id.* at 6-8, 36 (of 65 clients to whom Blue Ridge Legal Services provided

---

[42] Matthew G. Rosendahl and Kristi Kelly represented Green pro bono on her en banc appeal. Their dedication and generosity highlight just how vital pro bono work is in ensuring access to justice for those in need. Their efforts make a meaningful difference.

representation, 87.7% of cases were nonsuited before trial and 9.2% were dismissed at a hearing).  In particular, PRA nonsuited twelve of fourteen suits once defendants obtained representation, had their claim dismissed in one case, and obtained judgment in one case.  *Id.*  It is fair to tie this low success rate to widespread, poor recordkeeping practices.

In PRA's case, whether because of these recordkeeping practices or otherwise, a similar tendency to bring unsubstantiated lawsuits is clear.  In 2015, the Consumer Financial Protection Bureau cited PRA for engaging in numerous "deceptive acts and practices" under the Consumer Financial Protection Act and "false, deceptive, or misleading representation[s] or means" under the Fair Debt Collection Practices Act.  *Portfolio Recovery Assocs., LLC*, No. 2105-CFPB-0023, at 17-18, 22, 24 (Sept. 9, 2015) (consent order).  PRA had repeatedly made false representations that consumers owed them time-barred debt, filed affidavits in which affiants falsely claimed to have reviewed "account-level documentation from the original creditor," and falsely told consumers that they had a reasonable basis for believing that consumers owed them debts.  *Id.* at 18.

As redress, the CFPB ordered PRA to pay over twenty million dollars.  *Id.* at 44-49.  It also placed PRA under a federal order: PRA was prohibited from "collecting debts without a reasonable basis," a basis that could be "substantiated" at the time of the representation, and broadly prohibited from "deceptively collecting time-barred debt."  *Id.* at 28, 38.  And PRA was specifically "prohibited from" bringing "any Debt Collection Lawsuit unless" it possessed, reviewed, and offered to provide certain documentation to the alleged debtor.  *Id.* at 33-35.  This required documentation included

> Original Account-Level Documentation reflecting, at a minimum, the Consumer's name, the last four digits of the account number associated with the Debt at the time of Charge-off, the claimed amount excluding any post Charge-off payments . . . and, if Respondent is suing under a breach of contract theory, the contractual terms and conditions applicable to the Debt.

*Id.* at 33. The required documentation also included "properly authenticated . . . bills of sale or other documents evidencing the transfer of ownership of the Debt, at the time of Charge-off, to each successive Owner." *Id.* Each such document, the order said, "must contain a specific reference to the particular Debt being collected upon, which can be done by referencing an exhibit attached to each" document. *Id*. at 33-34.

PRA did not comply with the terms of the 2015 order. It sent "millions" of letters that failed to even offer the required chain of title documentation, and falsely claimed, hundreds of other times, that it could provide other required documents, such as Original Account-Level Documentation. *Complaint* at 7-8, *Consumer Fin. Prot. Bureau v. Portfolio Recovery Assocs.*, *LLC*, No. 2:23-CV-110 (E.D. Va. Mar. 23, 2023). Therefore, the Eastern District of Virginia placed PRA under a renewed order with substantially the same terms, again requiring them to possess and offer to provide Original Account-Level Documentation and account-specific chain of title documentation. And it ordered them to pay $12 million. Stipulated Final Judgment and Order at 14, 24, *Consumer Fin. Prot. Bureau v. Portfolio Recovery Assocs., LLC*, No. 2:23-CV-110 (E.D. Va. Apr. 13, 2023). In this case, Green's challenge to PRA's standing was a response to PRA's failure to provide the documentation that the federal government has on multiple occasions cited PRA for failing to provide.

In short, the practices of the debt buying industry often result in documentation problems. Green's suit has raised these problems. These observations about the observed practices of PRA and other large debt buyers emphasize the importance of adhering to our evidentiary principles in debt collection lawsuits in Virginia. No litigant should be permitted to shrug off the burden of proving their case because it is more profitable to do so.

Conclusion

The en banc majority's decision broadens the ability for individuals or debt buyers to sue the citizens of Virginia without requiring them to demonstrate standing or rights to collect. Thus, the majority has widely opened the doors and given permission to the world the legal ability to sue or collect debts from the citizens of Virginia without sufficient evidence of standing. PRA lacked standing to sue Green, and the circuit court erred by dismissing Green's counterclaim. For all the reasons stated throughout the dissent, I would reverse and vacate the circuit court's judgment against Green and remand for the court to enter final judgment that PRA does not have standing to sue Green, that Green does not owe a debt to PRA, and to further consider Green's counterclaim against PRA, over which the circuit court had jurisdiction.

*VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **19th** *day of* **March, 2024**.

PUBLISHED

Mazie Green,                                                                                                      Appellant,

against          Record No. 0144-22-3
                 Circuit Court No. CL21000587-00

Portfolio Recovery Associates, LLC,                                                        Appellee.


Upon a Petition for Rehearing En Banc

Before Chief Judge Decker, Judges Beales, Huff, O'Brien, AtLee, Malveaux, Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael Lorish, Callins and White


On March 1, 2023 came the appellee, by counsel, and filed a petition requesting that the Court set aside the judgment rendered herein on February 20, 2024, and grant a rehearing *en banc* on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the petition for rehearing *en banc* is granted and the appeal of those issues is reinstated on the docket of this Court. The mandate previously entered herein is stayed pending the decision of the Court *en banc*.

The parties shall file briefs in compliance with the schedule set forth in Rule 5A:35(b). The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter. An electronic version of each brief shall be filed with the Court and served on opposing counsel.[1]

A Copy,
            Teste:

                        A. John Vollino, Clerk

                        *original order signed by a deputy clerk of the*
            By:     *Court of Appeals of Virginia at the direction*
                        *of the Court*
                                    Deputy Clerk

---

[1] The guidelines for filing electronic briefs and appendices can be found at www.courts.state.va.us/online/vaces/resources/guidelines.pdf.

**PUBLISHED**

Present: Judges Malveaux, Ortiz and Causey
Argued at Lexington, Virginia

MAZIE GREEN

OPINION BY
v.      Record No. 0144-22-3       JUDGE DORIS HENDERSON CAUSEY
                                    FEBRUARY 20, 2024

PORTFOLIO RECOVERY ASSOCIATES, LLC

FROM THE CIRCUIT COURT OF ALLEGHANY COUNTY
Edward K. Stein, Judge

Mazie Green, *pro se*.

L. Steven Emmert (James K. Trefil; Jonathan P. Floyd; Sykes,
Bourdon, Ahern & Levy, PC; Troutman Pepper Hamilton Sanders
LLP, on brief), for appellee.


Mazie Green, *pro se*, appeals the circuit court order ruling for Portfolio Recovery

Associates, LLC ("PRA") in a debt-collection action. The circuit court granted judgment to PRA in

the amount of $8,914.31. On appeal, Green argues that PRA did not have standing to sue, that the

court erred by failing to consider her counterclaim alleging PRA violated the Fair Debt Collections

Practices Act ("FDCPA"), and that by releasing her cash bond to PRA, the General District Court of

Alleghany County violated the Fourteenth Amendment and FDCPA by issuing a recognizance on

PRA's behalf. Finding that PRA failed to prove it owned Green's debt, we reverse the circuit

court's decision.

BACKGROUND[1]

In December 2020, PRA, a debt buyer,[2] filed a warrant in debt against Green in Alleghany

County General District Court,[3] "alleging that she had defaulted on a [CIT] Bank credit card debt,

with an original account ending number of 7068 and a balance due of $8,914.31." PRA asserted

that it was the assignee of the debt. In support of its claim, PRA filed a bill of particulars, which

had the following documents attached as exhibits:

- A February 2020 letter from PRA to Green, listing the original creditor as CIT Bank and an "[o]riginal [a]ccount [n]umber" ending in 7068, and demanding payment on a balance due of $8,914.31

- A September 2010 document labeled "bill of sale" from CIT Bank to Webbank

- An August 2013 document labeled "bill of sale" from Webbank to Comenity Capital Bank

- A July 2018 document labeled "bill of sale" from Comenity Capital Bank to Synchrony Bank

---

[1] Because PRA prevailed at trial, "we recite the relevant facts in the light most favorable" to PRA and presume the factfinder accepted any reasonable inferences from those facts. *See Nichols Constr. Corp. v. Va. Mach. Tool Co.*, 276 Va. 81, 84 (2008). The record contains a written statement of facts in lieu of a transcript from trial, as permitted by Rule 5A:8(c). The statement of facts was prepared by Green and adopted by the circuit court over PRA's objection. Accordingly, we accept the court's signed statement of facts as the established facts of the case. *See* Rule 5A:8(d) ("The judge's signature on a transcript or written statement, without more, constitutes certification that the procedural requirements of this Rule have been satisfied.").

[2] Although Virginia has not adopted a definition of "debt buyer," we may rely on other jurisdictions' definitions as persuasive authority. *Thorne v. Commonwealth*, 66 Va. App. 248, 255 (2016) (relying on out-of-state cases as persuasive authority). A debt buyer is a person or entity that engages in the business of purchasing charged-off (charged-off means the act of a creditor that treats an account receivable or other debt as a loss or expense because payment is unlikely, Md. Rule 3-306) consumer debt for collection purposes, whether it collects the debt itself, hires a third party for collection, or hires an attorney-at-law for collection litigation. Cal. Civ. § 1788.50.

[3] This case involved a de novo appeal from the Alleghany County General District Court. The filings of the general district court are those relied upon in the circuit court.

- A June 2019 document labeled "bill of sale" from Synchrony Bank to PRA

- A two-column spreadsheet for an account number ending in 7068 with Green's name, but no creditor name, headings identifying the source or purpose of the document, or means of tying the record to any of the bills of sale

- An August 2020 declaration of James O'Toole, custodian of records for PRA, stating: "According to the records transferred to the Account Assignee from Account Seller, and maintained in the ordinary course of business by the Account Assignee, there was due and payable from Mazie Green . . . to the Account Seller the sum of $8,914.31 with respect to the account number ending in 7068." The affidavit stated that this finding was "based upon a review of the business records of the Original Creditor CIT BANK/PAYPAL and those records transferred to [PRA] from SYNCHRONY BANK . . . , which have become a part of and have integrated into [PRA]'s business records, in the ordinary course of business."

- A Synchrony Bank pricing information addendum for "PayPal credit account ending in 7068"

- Monthly PayPal billing statements, spanning July 2017-September 2018, listing customer name Mazie Green and an account number ending in 8616.

The "bills of sale" did not mention any specific debtor names or account numbers or include any attachments with that information. None of the bills of sale listed Green's name or account number. Additionally, transfer agreements identifying which specific accounts were sold were not attached to any bill of sale. PRA's custodian of records claimed that such records (which perhaps identified Green, or any accounts/agreements) were confidential. The PayPal billing statements showed that someone named Mazie Green last used the account on March 3, 2018, and that the last payment on the account was on February 12, 2018.

- 3 -

In response to the complaint, Green filed a grounds of defense asserting that PRA lacked standing to sue her because it had not produced evidence of chain of title[4] to prove its ownership of the debt. Prior to this, Green had asked repeatedly for the debt to be validated. Green also filed a counterclaim for $1,000 under the Fair Debt Collection Practices Act (FDCPA). She argued that PRA violated the FDCPA by "not reviewing their business records or ones they have been allegedly assigned," "robo-signing" the affidavit of James O'Toole, and attaching "a deceptive, misleading, and undated letter" to the warrant in debt informing her that a lawsuit had been filed. Green also sought a declaratory judgment that PRA violated the FDCPA.

In April 2021, Green sent a request for a continuance to the general district court. Green "received no response to her request and appeared, prepared for trial on May 24, 2021." At trial, PRA "said they were not prepared for trial because of . . . Green's letter and their witness was not there." Green signed a recognizance, promising to appear for a hearing in July 2021.

Following an agreed-upon continuance, the general district court conducted a hearing in September 2021. The general district court ruled for PRA and dismissed Green's FDCPA counterclaim. The general district court set an appeal bond of $8,977.31, which Green posted when she appealed the ruling to the circuit court.

Green moved for summary judgment in the circuit court, asserting that PRA lacked standing. Green informed the circuit court that "[t]he original account ending number was 7068, but [PRA] provided the [c]ourt with a Pay[P]al Credit statement account number ending in 8616." Green argued that PRA had "(1) no valid proof of assignment [validation of the debt], (2) no proof that the original account number ending in 7068 changed to account number ending in 8616, and

_____

[4] Chain of title is admissible documentation establishing that the debt buyer is the owner of the specific debt at issue. The chain of title must be unbroken.

- 4 -

(3) ha[d] no contract for C[IT] Bank account ending in 7068." She claimed that she was therefore entitled to judgment as a matter of law. The circuit court denied Green's motion.

The circuit court held a bench trial in November 2021. At trial, PRA called Lecinda Stacy, a PRA custodian of records, as a witness. On cross-examination, Stacy testified that the account being sued upon ended with 7068. Stacy testified that each bill of sale was accurate and complete, but also that no bill of sale included any attachments. When asked why the transfer agreements identifying which specific accounts were sold were not attached to each bill of sale, Stacy said that the specific accounts were confidential because they contained other individuals' names and account numbers. Stacy also testified that none of the bills of sale listed Green's name or account number. Stacy further testified that the data sheet listing an account number ending 7068 included with the bill of particulars lacked the creditor's name and was created at or near the time that accounts were sold to PRA. Finally, Stacy testified that the account number on the PayPal credit billing statement ended in 8616 and when asked by Green "if the account ending number of 7068 was the same as the account ending number 8616," Stacy said, "no." Overall, Stacy did not provide any information that Green was the debtor or articulate why PRA was suing this particular Mazie Green. Other than having the same name, PRA was unable to provide any other identifying information connecting Green to the alleged debt owed.

Green submitted into evidence PRA's notice of filing of a warrant in debt. She also submitted an email conversation with a PRA attorney from September 2021. In the email exchange, Green asked the attorney why the account number in the billing statements differed from the original CIT Bank account number and the attorney responded, "[s]ince the account was sold to other creditors numerous times since originally opened in 2010, I do not have a record of the exact time the original account number was changed." The attorney recommended Green contact CIT Bank for more information.

- 5 -

PRA sought to introduce an affidavit from Oscar Castillo, an "Affidavit Documentation Specialist" at Synchrony Bank, dated November 16, 2021. Castillo's affidavit stated that Green was "issued a credit card account with account number ending in 8616" on September 16, 2018, and then the "account number was changed from account ending in 8616 to account ending in 7068" on June 24, 2019. The affidavit also attested that the account was sold to PRA on June 27, 2019, and that Synchrony Bank's records documented the sale. PRA also introduced all the exhibits to its bill of particulars.

After hearing the parties' evidence and arguments, the circuit court ruled for PRA. The circuit court held that PRA could recover $8,914.31 from Green and ordered the circuit court clerk to release the appeal bond to PRA to satisfy the judgment. The court also found that Green's counterclaim failed. This appeal follows.

## ANALYSIS

### I. Ownership of the Debt

Green argues PRA could not recover from her because PRA failed to prove it owned her debt. We agree.

#### A. *The Debt Buying Industry*

PRA is a debt buyer. The debt buying industry has exploded over the past twenty years. *See* Fed. Trade Comm'n, *The Structure and Practices of the Debt Buying Industry* 12-14 (2013) http://www.ftc.gov/sites/default/files/documents/reports/structure-and-practices-debt-buying-industry/debtbuyingreport.pdf [hereinafter *Structure and Practices*]. The growth in this industry has inevitably led to litigation. Courts around the country have been compelled to confront their practices. Virginia courts have little precedent related to debt buying, so we rely on cases from other jurisdictions and secondary sources to provide a framework and backdrop to better

understand the industry. *Thorne v. Commonwealth*, 66 Va. App. 248, 255 (2016) (relying on out-of-state cases as persuasive authority).

The debt-buying industry works in the following manner: first, a creditor and a consumer enter a contract by which the creditor (i.e., a bank) extends credit to the consumer—often through a credit card—in exchange for a promise to be repaid later. *Structure and Practices*, *supra*, at 11, 13. When a consumer falls behind on repaying a creditor, the creditor often "charge[s] off" the debt as unrecoverable and sells the rights to recover the debt to a debt buyer who specializes in collecting delinquent debts. *Taylor v. First Resol. Inv. Corp.*, 72 N.E.3d 573, 578 (Ohio 2016); Consumer Fin. Prot. Bureau, *Fair Debt Collection Practices Act: CFPB Annual Report 2013*, at 9 (2013), https://files.consumerfinance.gov/f/201303_cfpb_March_FDCPA_ Report1.pdf. The debts sold are usually "bundled" into portfolios of many accounts, which the debt buyer purchases at cents on the dollar compared to the face value of the collective debt owed. *Taylor*, 72 N.E.3d at 578; *Structure and Practices*, *supra*, at 7-8, app. D (study showing that between 2006 and 2009, the nine largest debt buyers—including PRA—collectively purchased consumer debt with face value of $143 billion for $6.5 billion). The debt buyer then either attempts to collect the debt or sells the debt to another debt buyer. *Structure and Practices*, *supra*, at 19. "Many debts are purchased and resold several times over the course of years before either the debtor pays the debt or the debt's owner determines that the debt can be neither collected nor sold." *Id.* at 1.

Debt buying has a role to play in the consumer lending industry. "Debt buying can reduce the losses that creditors incur in providing credit, thereby allowing creditors to provide more credit at lower prices." *Id.* at i. But the business model depends on debt buyers using the legal process (or the threat of a lawsuit) to collect on enough of the many debts they have bought to generate a profit. *See Taylor*, 72 N.E.3d at 578. And that is when problems can arise.

In the course of a debt being sold several times, "documentation of information about the debt is often lost." *Id.* In a 2013 study, the Federal Trade Commission (FTC) found that while buyers receive some information about the debt they are purchasing, "[f]or most portfolios, buyers did not receive any documents at the time of purchase" and "[o]nly a small percentage of portfolios included documents, such as account statements or the terms and conditions of credit." *Structure and Practices*, *supra*, at ii-iii. Without adequate documentation, debt buyers can have trouble proving in court that they own the debts they seek to collect. Some debt buyers get around this by having employees sign affidavits for hundreds or thousands of debts per day, attesting personal knowledge of the facts of each case despite the impossibility of verifying the information for that many accounts that quickly (a practice called "robo-signing"). Peter A. Holland, *The One Hundred Billion Dollar Problem in Small Claims Court: Robo-Signing and Lack of Proof in Debt Buyer Cases*, 6 J. Bus. & Tech. L. 259, 268-69 (2011). But even for debt buyers acting in good faith, documentation is only a problem if the debt buyer is in fact forced to prove it owns a debt. "Empirical evidence shows that many debt buyers using a high volume of lawsuits as a component of their recovery strategy rely heavily on the assumption that consumers often fail to show up to contest the case," allowing debt buyers to win default judgments. *Taylor*, 72 N.E.3d at 578-79 (quoting Note, *Improving Relief from Abusive Debt Collection Practices*, 127 Harv. L. Rev. 1447, 1449 (2014)) [hereinafter *Improving Relief*]); *see also id.* at 578 (observing that the debt buying industry is "dependent in large part on the acquiescence, ambivalence, or ignorance of consumers").

Lack of adequate documentation leads to mistakes. "A predictable result of debt buyers filing a high volume of lawsuits based on imperfect information is that lawsuits are regularly filed after the right to collect debts has expired or that seek to collect a debt that is not owed." *Id.* at 579; *see also Structures and Practices*, *supra*, at i (because debt buyers "may have

insufficient or inaccurate information when they collect on debts," debt buyers can end up "seeking to recover from the wrong consumer or recover the wrong amount"). The FTC found that from 2006 to 2009, debt buyers "sought to collect about one million debts [per year] that consumers asserted they did not owe." *Structures and Practices*, *supra*, at iv. That rate of disputed debts alone "is a significant consumer protection concern" to the FTC. *Id.* at 39.

But the number of debts disputed likely understates the lack of information problem because consumers often do not challenge debts. *Id.* at 38. Ninety percent or more of consumers sued in debt collection actions do not appear in court to defend themselves, resulting in many default judgments. *Id.* at 45. Some consumers do not receive the validation notices that debt collectors are required to send before collecting on the debt; others "may not read or understand the validation notice because it does not identify the original creditor, they may assume it is junk mail, or they find writing a letter to be unduly burdensome." *Id.* at 38. And "many consumers may not respond due to a misunderstanding of the legal procedures required to avoid default." *Taylor*, 72 N.E.3d at 579 (quoting *Improving Relief*, *supra*, at 1449).

In short, debt-buying industry practices often result in documentation problems. These very problems are presented in this action. Green raised these issues, and we now address her argument that PRA failed to prove it owned her debt.

*B. PRA Lacked Standing*

Green frames her argument as a question of PRA's standing to sue her. She argues that because PRA failed to prove it owned a debt she owed, it lacked a personal stake in the outcome, and thus lacked standing, rendering PRA's suit against her "a legal nullity." *See Kocher v. Campbell*, 282 Va. 113, 119 (2011). Green presents a relatively unsettled question on appeal— whether a plaintiff attempting to collect on a delinquent obligation without proof that it owns the debt raises a question of standing or a defect in the plaintiff's case-in-chief. Courts in other

jurisdictions are split on the issue,[5] and Virginia has only considered the matter in the context of real

property.[6] We hold that the assignment of rights alleged here created a standing issue.[7] Further,

because PRA failed to establish its ownership of a debt owed by Green,[8] we hold that PRA had no

legally cognizable interest in the alleged controversy.

[5] *Compare Unifund CCR v. Ayhan*, 146 Wash. App. 1026 (Wash. Ct. App. 2008) (treating insufficient proof of ownership of debt as a question of standing), *and Deutsche Bank Nat'l Tr. Co. v. Mitchell*, 27 A.3d 1229, 1234-35 (N.J. Super. Ct. App. Div. 2011) ("As a general proposition, a party seeking to foreclose a mortgage must own or control the underlying debt. In the absence of a showing of such ownership or control, the plaintiff lacks standing to proceed with the foreclosure action and the complaint must be dismissed." (internal punctuation and citations omitted)), *with Nyankojo v. N. Star Cap. Acquisition*, 679 S.E.2d 57, 58, 61 (Ga. Ct. App. 2009) (holding that debt buyer lacking proof of assignment failed to establish the elements of its case, despite defendant framing question as one of standing), *and Cap. Prop. Mgmt. Corp. v. Nationwide Prop. & Cas. Ins. Co.*, 757 Fed. App'x 229, 232 n.1 (4th Cir. 2018) (noting that although the lower court "framed its analysis [of whether the plaintiff proved assignment] as [the plaintiff]'s failure to establish standing . . . , the proper inquiry is whether [the plaintiff] failed to state a claim for breach of contract").

[6] *Morgan v. Board of Supervisors of Hanover County*, ___ Va. ___, ___ (Feb. 2, 2023), established that a defense to liability does not implicate standing in Virginia merely because it "requires proof of a specific legal right that was infringed and that is capable of being remedied by a court." In *Morgan*, the Virginia Supreme Court considered whether the plaintiffs had standing to challenge a zoning exception issued by the local board that authorized the construction of a 1.7 million square foot grocery distribution center. *Id.* at ___. Roderick Morgan, a property owner whose land was located within a thousand feet of the proposed facility, was among the many neighbors that disputed approval of the project and brought action. *Id.* at ___. Although none of the class members held an ownership interest in the subject property, the Court held they had standing to challenge the zoning determination after the plaintiffs (1) proved ownership of property in close proximity to the subject property and (2) alleged facts of a particularized harm arising out of the board's approval of the plan. *Id.* at ___. In its reversal of the circuit court's decision that the plaintiffs did not have standing, the Court reiterated that the actual controversy requirement protects courts from issuing advisory opinions—an essential concern of the standing doctrine—and cautioned courts to avoid "conflat[ing] the threshold standing inquiry with the merits of [a litigant's] claim." *Id.* at ___ (second alteration in original) (quoting *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 312 (4th Cir. 2009)).

[7] *See* discussion *infra* Section I.C.

[8] The Consumer Financial Protection Bureau has enjoined PRA from collecting the type of debt Green has disputed without offering to provide Original Accounting Level Documentation. Filing lawsuits for unsubstantiated debt is also prohibited. *In the Matter of:*

- 10 -

Whether a litigant has standing is subject to de novo review. *Platt v. Griffith*, 299 Va. 690, 692 (2021) ("We review de novo the question of whether the appellants' factual allegations were sufficient to establish standing, as this issue presents a question of law.").

"[S]tanding to maintain an action is a preliminary jurisdictional issue having no relation to the substantive merits of an action." *McClary v. Jenkins*, 299 Va. 216, 221 (2020) (quoting *Andrews v. Am. Health & Life Ins. Co.*, 236 Va. 221, 226 (1988)). "The point of standing is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case." *Anders Larsen Tr. v. Bd. of Supervisors of Fairfax Cnty.*, 301 Va. 116, 120 (2022) (quoting *Cupp v. Bd. of Supervisors of Fairfax Cnty.*, 227 Va. 580, 589 (1984)). Here, PRA did not provide or identify any information that showed that it had any "substantial legal rights" that would be affected—namely, that PRA owned a debt owed by Green.

"[S]tanding requires particularized harm to 'be fairly traceable to the challenged action of the defendant.'" *Morgan v. Bd. of Supervisors of Hanover Cnty.*, ___ Va. ___, ___ (Feb. 2, 2023) (quoting *Mattaponi Indian Tribe v. Va. Dep't of Env't Quality, ex rel. State Water Control Bd.*, 261 Va. 366, 376 (2001)). A plaintiff must "[allege] that [the particular] defendant [engages in the type of activity] that causes or contributes to the kinds of injuries alleged." *Chesapeake Bay Found., Inc. v. Commonwealth, ex rel. Va. State Water Control Bd.*, 52 Va. App. 807, 825 (2008) (alterations in original) (emphasis omitted) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 161 (4th Cir. 2000)).

Similarly, here, we must determine whether Green took actions that were fairly traceable to the injury of which PRA complains. The FDCPA requires debt collectors to validate consumers'

*Portfolio Recovery Assocs., LLC*, CFPB No. 2015-CFPB-0023 (Sept. 9, 2015), https://files. consumerfinance.gov/f/201509_cfpb_consent-order-portfolio-recovery-associates-llc.pdf.

debts within five days of the initial communication[9] with a consumer. 15 U.S.C.A. § 1692g(a).

The validation information must be clear and conspicuous. Per 15 U.S.C.A. § 1692g(a), a debt

collector must provide the following information to validate a debt:

- the amount of the debt;

- the name of the creditor to whom the debt is owed;

- a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

- a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

- a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

Once the validation information is provided, the consumer has 30 days to dispute the validity of

the debt and/or request the information about the original creditor. 15 U.S.C.A. § 1692g(b). "If

the consumer notifies the debt collector" within this thirty-day period, the debt collector must

> cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector.

*Id*.

PRA asserts ownership of Green's debt through a series of assignments. When pursuing an

action on a contract or instrument assigned, an assignee "stands in the shoes" of the assignor,

---

[9] A formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a). 15 U.S.C.A. § 1692g(d).

obtaining all the assignor's rights and remedies. *Union Recovery Ltd. P'ship v. Horton*, 252 Va. 418, 423 (1996) (quoting *Mountain States Fin. Ress. Corp. v. Agrawal*, 777 F. Supp. 1550, 1552 (W.D. Okla. 1991)). Our Supreme Court has long held that a party seeking to prove ownership of a contractual right by assignment bears the burden of proving that the assignment occurred. *See Tennent's Heirs v. Pattons*, 33 Va. (6 Leigh) 196, 207 (1835) (Carr, J.) (finding trial court erred in allowing plaintiffs to sue as assignees where no proof of assignment was in the record). Although Virginia courts have not outlined precisely how to prove a legal assignment occurred, other courts have held that "there must be evidence of an intent to assign or transfer the whole or part of some specific thing, debt, or chose in action and the subject matter of the assignment must be described sufficiently to make it capable of being readily identified." 29 *Williston on Contracts* § 74:1 (4th ed. 2022) (collecting cases). And to recover a debt from a purported debtor, a party must prove that it owns the right to the *specific* debt at issue. *See Lewis's Ex'r v. Bacon's Legatee*, 13 Va. (3 Hen. & M.) 89, 114 (1808) (Fleming, J.). A debt buyer who alleges a right to a debt by assignment thus must trace the chain of its title to the specific debt it seeks to recover. The trace of the chain of title may not be broken. It must be continuous to establish the assignment.

A debt buyer (or any purported owner of the right to recover a debt) may introduce several forms of evidence to prove ownership of the specific account at issue. PRA sought recovery on breach of contract and account stated theories. For a debt based on a written contract, the best-evidence rule requires that "where the contents of a writing are desired to be proved, the writing itself must be produced or its absence sufficiently accounted for before other evidence of its contents can be admitted." *Brown v. Commonwealth*, 54 Va. App. 107, 115 (2009) (emphasis omitted) (quoting *Bradshaw v. Commonwealth*, 16 Va. App. 374, 379 (1993)). If the original contract is unavailable, Code § 8.01-32 provides that a plaintiff may still bring suit on "any past-due lost . . . contract . . . or other written evidence of debt, provided the plaintiff

- 13 -

verifies under oath either in open court or by affidavit that said . . . contract . . . or other written evidence of debt has been lost or destroyed." For a debt based on an account stated, the plaintiff must prove that "the accounts between the parties have been either actually settled, or are presumed to be so from the circumstance of a party's retaining, for a long time, without objection, the account of the other party, which has been presented to him, showing a balance against him." *Ellison v. Weintrob*, 139 Va. 29, 35 (1924) (quoting *Watson v. Lyle's Adm'r*, 31 Va. (4 Leigh) 236, 249 (1833)). Relevant evidence for an account stated includes documentation or sworn testimony that a balance is final and definite and that the plaintiff sent account statements received by the defendant without the defendant's objection within a reasonable time. *See id.* at 31, 35-36; *Radford v. Fowlkes*, 85 Va. 820, 852 (1889).

A debt buyer must then introduce evidence to prove that it has been assigned that original contract or account between creditor and debtor. For debt buyers, available documentation typically includes the purchase and sale agreements between each assignor and assignee in the chain of title, along with files listing information on the specific accounts transferred from assignor to assignee. *See New Century Fin. Servs., Inc. v. Oughla*, 98 A.3d 583, 591 (N.J. Super. Ct. App. Div. 2014). Under Virginia Rules of Evidence 2:803(6) and 2:902(6), a debt buyer can produce a live witness or affidavit of a custodian of record *if* the testimony or certification can show that someone with personal knowledge produced a reliable record of the debt and its transfer in the ordinary course of business. And the debt buyer can present live witness testimony about the ownership of the debt more generally, so long as "evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Va. R. Evid. 2:602.

Again, whatever admissible evidence the plaintiff chooses to present must meet its burden of proof to show it owns the *specific* debt at issue. *See Lewis's Ex'r*, 13 Va. (3 Hen. & M.)

at 114. To trace a series of assignments back to the original creditor-debtor contract and prove the plaintiff owns the defendant's debt, evidence of each assignment must contain, at minimum, the debtor's name and account number associated with the debt.

This case's facts are analogous to *Green v. Ashby*, 33 Va. (6 Leigh) 135 (1835). In *Ashby*, the trial court found that the plaintiff, who alleged he had been assigned the right to payment of a judgment debt against the debtor, could recover from the defendant, who was the purported assignor's attorney and had been paid the judgment debt. *Id.* at 135. The plaintiff presented the following evidence that a purported assignor had assigned him the right to collect: bills for fees that the purported assignor owed the plaintiff; a "mutilated paper, of which no sense c[ould] be made" which the plaintiff testified was authority to prosecute and recover the judgment from the debtor; and testimony from a witness who said the plaintiff had told him the plaintiff had an interest in the claim, but that he "never saw any assignment." *Id.* at 144 (Carr, J.). Our Supreme Court reversed. Justice Carr found that even "allowing [the evidence] the utmost weight that in fairness can be claimed for it, it proves no transfer of th[e] debt . . . from [the purported assignor] to the [purported assignee]." *Id.* While the assignee said the debt was his, "surely, this, without assent or even knowledge of the claim by [the assignor], could prove nothing." *Id.* The scant evidence could not "create that privity which is necessary to support an action" by the plaintiff against the defendant. *Id.* at 145.

As in *Ashby*, to prove it had been assigned Green's debt, PRA introduced several pieces of documentary evidence along with testimony supporting those documents. And, as in *Ashby*, PRA needed more evidence to meet its burden to prove it owned the right to recover on Green's specific account.

In other words, who owes the debt and who legally can collect the debt must be stated clearly in the documentary evidence. Random spreadsheets with numbers do not meet the burden to

- 15 -

prove who owns the right to recover a debt. A bill of sale must contain all the information and attachments to authenticate the debt. At a minimum, the bill of sale must identify the debtor and the amount of debt owed. The debt cannot be authenticated if there is no information in the bill of sale that identifies the person or company regarding the details of the debt.

First, the documents PRA produced include no evidence that Green's account traced back from PRA to CIT Bank. PRA sought to trace its ownership of Green's debt back to CIT Bank through a series of four bills of sale: from CIT Bank to Webbank in September 2010, from Webbank to Comenity Capital Bank in August 2013, from Comenity Capital Bank to Synchrony Bank in July 2018, and from Synchrony Bank to PRA in June 2019. The first three bills of sale are one-page documents that mention only "accounts" or "assets" transferred between the companies; no attachments are mentioned in the bills of sale, and no documents introduced to the record list the specific account numbers transferred in each sale. The final bill of sale from Synchrony Bank to PRA mentions "the Accounts as set forth in the Notification Files," but PRA did not produce the "notification files." PRA did produce a two-column spreadsheet with data for an account number ending in 7068 with Green's name, but the spreadsheet lacked a date, creditor name, and any means of tying the spreadsheet to a specific bill of sale or otherwise identifying the source or purpose of the document.[10] It also produced a Synchrony Bank "pricing information addendum" for an account ending in 7068, which PRA points to on brief as the "underlying PayPal account

---

[10] PRA argues it could not produce further documentation of the accounts sold because doing so would result in other customers' confidential account information being included. We agree that other customers' confidential account information has no relevance and should not be produced. But PRA's argument neither explains why a spreadsheet or other documentation could not be produced for each bill of sale for *Green's* debt specifically, nor why the spreadsheet produced includes no headings or other information that tie it back to a specific bill of sale.

- 16 -

agreement," but the addendum lacked Green's name, signature, and the date of the agreement.[11] And the monthly PayPal billing statements from July 2017 through September 2018 listing customer name Mazie Green list a different account number ending in 8616 and fail to cover the first 7 years of the account's alleged history. We find this jumble of documents, without more, akin to the mutilated paper in *Ashby* that purported to show the plaintiff had been assigned the claim he sought to recover on.

With the documents unable to support chain of title or even the existence of the initial agreement, that leaves the affidavits and testimony through which PRA sought to tie the documents together. PRA introduced as a trial exhibit an affidavit signed and dated November 16, 2021—the day before trial—by Castillo, "[s]enior [m]edia [a]ffidavit [r]epresentative" at Synchrony Bank. Castillo attested that, based on his review of Synchrony Bank's records, Green was issued a credit card account ending 8616 on September 16, 2018, that account was changed to a number ending 7068 on June 24, 2019, and the account was sold to PRA on June 27, 2019. PRA also presented Stacy, a PRA custodian of records, as a trial witness. Stacy testified that the two-column spreadsheet with account number ending 7068 was produced near the time of the sale from Synchrony to PRA.[12] She did not testify that Green's specific name and account number were part

---

[11] In addition to being evidence that PRA did not own Green's debt, we note that this could also be evidence that PRA failed to produce an underlying contract or agreement. *See Brown*, 54 Va. App. at 115; *Bradshaw*, 16 Va. App. at 379. Code § 8.01-32 outlines the procedures for lost written evidence of a debt, but the record does not include evidence that PRA "verifie[d] under oath either in open court or by affidavit that said . . . contract . . . or other written evidence of debt has been lost or destroyed." That said, Green did not assign error to the trial court on this point.

[12] Stacy also testified on cross-examination that the account number on the PayPal credit billing statements ended 8616, and when asked by Green "if the account ending number of 7068 was the same as the account ending number 8616," Stacy said, "no." This response could reasonably be interpreted as an admission that the two accounts were different. But viewing the facts in the light most favorable to PRA, we assume Stacy was making the equally reasonable observation that 7068 and 8616 are two different numbers.

of each assignment in the alleged chain of title—which, of course, she could not, because as custodian of records at PRA, she could at most have personal knowledge, required by Rules 2:602 and 2:803(6), of the transaction between Synchrony Bank and PRA. She testified only that, for each of the four bills of sale, the transfer agreement that would presumably list the specific account numbers transferred could not be produced because "they contained the names and account numbers of others" and were thus "confidential." On balance, in the light most favorable to PRA, Castillo's affidavit and Green's testimony show only that Synchrony information for an account ending 8616 in Green's name was changed to one ending 7068 just before sale, and that account was sold to PRA. Castillo and Stacy said nothing from which the circuit court could conclude that the chain of title for an account in Green's name passed from CIT Bank to Webbank, Webbank to Comenity Capital Bank, or Comenity Capital Bank to Synchrony Bank. For those first three assignments, as in *Ashby*, testimony purporting to tie the documents to the chain of assignments showed no knowledge of the assignment.

However, O'Toole's affidavit that PRA owned Green's debt "based upon a review of the business records of the Original Creditor CIT BANK/PAYPAL and those records transferred to [PRA] from SYNCHRONY BANK . . . , which have become a part of and have integrated into [PRA]'s business records, in the ordinary course of business," is a single document that supports the debt owed. But O'Toole, as custodian of records at PRA, could not have had personal knowledge of the business practices of Synchrony, Comenity Capital Bank, Webbank, or CIT Bank. Thus, we hold that without more evidence that Green's account number was included in each transfer along the alleged chain of title, the circuit court was plainly wrong to find PRA proved ownership of Green's debt. O'Toole's testimony is unsupported by any documentary evidence or other testimony. And even accepting, in the light most favorable to PRA, that Castillo's affidavit and

- 18 -

Stacy's testimony established that the accounts ending 8616 and 7068 were the same, no evidence links either account number back to CIT Bank, Webbank, or Comenity Capital Bank.

Other jurisdictions have reached the same conclusion when debt buyers present similar evidence of ownership of a debt as what PRA presented here. The Ohio Court of Appeals reversed a trial court finding that the plaintiff debt buyer owned a debt through two assignments, holding that even if an affiant could properly authenticate "an uncertified Bill of Sale and an unconnected sheet of paper consisting of a single entry which purported to show the specific note was transferred from [the intermediate assignee] to [the plaintiff]," the plaintiff would still need to produce documentation for each account "referenc[ing] the specific account number of the debtor's account." *Premier Cap., LLC v. Baker*, 972 N.E.2d 1125, 1133, 1134 (Ohio Ct. App. 2012). The Wisconsin Court of Appeals similarly found that, for a debt allegedly assigned three times, bills of sale that "did not specifically reference any individual accounts or debts" or include any referenced attachments were not "evidence indicating that [the plaintiff] own[ed] [the defendant's] *specific debt*." *Gemini Cap. Grp., LLC v. Jones*, 904 N.W.2d 131, 136-38 (Wis. Ct. App. 2017) (also finding that "nothing in [the plaintiff's custodian of records'] affidavit reasonably implies that [the custodian] would have had personal knowledge of the prior assignments of [the defendant's] debt); *see also Wirth v. Cach, LLC*, 685 S.E.2d 433, 435 (Ga. Ct. App. 2009) (reversing trial court finding that the debt buyer owned the defendant's debt because the affidavit of the plaintiff's custodian of records "fail[ed] to refer to or attach any written agreements which could complete the chain of assignment from [the original creditor] to [the plaintiff]" and there was "no contract or [appendix] appended to the Bill of Sale which identifie[d] [the defendant]'s account number as one of the accounts [the original creditor] assigned to [the plaintiff]"); *Kenny v. Portfolio Recovery Assocs., LLC*, 464 S.W.3d 29, 34 (Tex. App. 2015) (finding no evidence of ownership of debt where bills of

sale offered to prove assignments "d[id] not identify which accounts were transferred" and instead "identifi[ed] another document that contains the information" that "[was] not a part of the record").

In sum, we hold that a plaintiff who asserts ownership of a debt by assignment must produce evidence, for *each and every* assignment, showing the chain of title for the debt passed from the original assignor to the plaintiff. At minimum, such evidence must show that the defendant's account number, along with other relevant identifying information, was included in the assignment (e.g., an attachment to a bill of sale listing account numbers and other identifying information that traces back to the bill of sale by affidavit). If the claim is based on a written contract, the plaintiff must produce evidence that the defendant signed and dated that agreement, or otherwise follow the lost document affidavit procedures at Code § 8.01-32. If documentary evidence is unavailable for a given assignment, the plaintiff must produce, by witness testimony or an affidavit, evidence from a custodian of record or other qualified individual with personal knowledge that the defendant's specific account was assigned. *See* Va. R. Evid. 2:602; 2:803(6); 2:902(6).

Even viewed in the light most favorable to PRA, the scanty and incomplete evidence in the record cannot prove that PRA owns Green's debt through a chain of title tracing back to CIT Bank. The circuit court was plainly wrong in finding otherwise.[13]

### C. PRA's Failure to Prove Ownership of Green's Debt

Even if PRA did have standing to sue Green, the circuit court erred in ruling in favor of PRA because there is no reliable evidence in the record to support its claim.[14] PRA failed to take

---

[13] Because we reverse and vacate the judgment against Green, we need not reach her third assignment of error, which argued that the court's decision to pay PRA the cash bond in the amount of the alleged debt violated Green's right to due process and right to be free from illegal seizure.

[14] In her brief, Green's arguments focus on the lack of evidence presented by PRA. Further, she argues that "The absence of specific documents mentioned in the [bills of sale] make an assignment unclear." These are arguments about the merits of the case, specifically,

any reasonable steps to substantiate the accuracy and validity of the debt, and it did not provide any meaningful accounting to explain how Green's purported debt was assigned. Thus, to the extent she intended to challenge the merits of PRA's claim rather than its standing, we hold that Green should have prevailed. PRA failed to provide a reasonable level of documentary proof that it held legal title to a debt belonging to Green.

The warrant in debt lacked documentation supporting the full chain of the assignment and failed to establish that PRA owned the debt. Compounding the problem were the multiple layers of assignment. Evidence of transfer must establish an unbroken chain of ownership. Each assignment or other writing evidencing transfer of ownership must contain the debtor's name and the account number associated with the debt.

PRA's claim was based on a written instrument—a contract between PayPal and Green. But the original document was not produced, and its omission was not excused by the court for good cause or by statute. Rule 7B:5. Nor was there any indication that the original document was lost. A lost document affidavit should have been submitted, pursuant to Code § 8.01-32. Without this documentation, proof of the amount owed was not established or validated. The affidavits and various other documents did not provide proof of the debt nor the amount of the debt.

## II. Green's Counterclaim[15]

Green filed a counterclaim for $1,000 under the FDCPA, 15 U.S.C. §§ 1692-1692p. Her counterclaim alleged that PRA violated the FDCPA by "not reviewing their business records or ones they have been allegedly assigned," "robo-signing" the affidavit of O'Toole, and attaching "a

---

arguments that PRA has not sufficiently established that it owned any debt owed by Green. These arguments sufficiently contest the circuit court's ruling for PRA on the merits.

[15] In her brief, Green argues that "[t]he trial court erred as a matter of law by finding that . . . Green's FDCPA counterclaim failed." This statement sufficiently raises the argument that the trial court erred in ruling for PRA on Green's counterclaim.

deceptive, misleading, and undated letter" to the warrant in debt informing her that a lawsuit had been filed. The circuit court entered judgment against Green on her counterclaim.

As stated above in Section I.B., the FDCPA requires debt collectors to validate consumers' debts within five days of the initial communication with a consumer. The requirements of the FDCPA are laid out in that section, above. *See generally* 15 U.S.C.A. § 1692g.

A debt collector who fails to comply with any provision of the FDCPA with respect to any person is liable to such person in an amount set by law.[16] 15 U.S.C.A. § 1692k. In determining the amount of liability under the FDCPA in an individual action, courts are required to consider the following factors: the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional. *Id.*

Here, the circuit court abused its discretion by finding the debt was valid and dismissing Green's counterclaim. As evidenced by the record, Green repeatedly asked that her debt be validated by PRA and it was not. Although the debt is required to be validated prior to the legal proceeding, even if this Court considers Stacy's testimony at trial, PRA still did not provide the proper information to validate the debt. As outlined above, at trial Stacy testified that (i) none of the bills of sale listed Green's name or account number, (ii) the data sheet listing an account number ending 7068 included with the bill of particulars lacked the creditor's name, and (iii) the account number on the PayPal credit billing statement ended in 8616 was not the same account as the

---

[16] This includes amounts equal to the sum of "any actual damage sustained by such person as a result of" the violations; in a case filed by an individual, damages up to $1,000 in the discretion of the court; or in a class action case, individual damages for named class members up to $1,000 and a collective recovery up to $500,000 or one percent of the net worth of the offending debt collector. 15 U.S.C.A. § 1692k(a). Claimants may also recover attorney fees and costs. *Id.*

account ending number of 7068.  PRA largely bases its sufficiency argument on inadequate

spreadsheets and testimony that fails to verify that the debt was owed by Green.  Additionally, at

oral argument, both Green and PRA were asked if the debt was validated and neither party could

point to any evidence to answer that question affirmatively.

PRA asks this Court to draw an inference, based on the circuit court's statement of facts,

Castillo's affidavit, and Stacy's testimony at trial, that PRA established that the debt belonged to

Green.  However, none of these pieces of evidence, considered individually or collectively, are

enough to satisfy PRA's burden of verifying or validating the debt, and the circuit court was

plainly wrong in determining that the debt was valid.  Verifying and validating a debt are critical

parts of the debt collection process that ensures fairness in debt collections.[17]  Because PRA has

not validated the debt here, we remand the case for the circuit court to re-examine whether PRA

violated the FDCPA.

---

[17] Considering the factors laid out in 15 U.S.C.A. § 1692k, PRA's failure to validate the debt clearly demonstrated their noncompliance with the FDCPA.  The "evidence" PRA presented at trial is questionable at best and fails to validate the debt as required by the FDCPA.  Additionally, Green's allegations that PRA was engaged in "robo signing" the affidavit of O'Toole, and attaching "a deceptive, misleading, and undated letter" would also violate the FDCPA and flies in the face of the very behavior against which the federal legislature is trying to protect.  The nature of PRA's noncompliance not only comes at a significant financial detriment to Green but is also in violation of one of the most basic and fundamental requirements under the FDCPA, to validate and verify the debt.  Finally, in addition to the aforementioned factors, PRA has history of violating FDCPA, which is a factor this Court "shall consider" in determining the amount of liability in this action.  *See* 15 U.S.C.A. § 1692k(b); *see also Wiley v. Portfolio Recovery Assocs., LLC*, 594 F. Supp. 3d 1127 (D. Minn. 2022); *Pantoja v. Portfolio Recovery Assocs., LLC*, 852 F.3d 679 (7th Cir. 2017); *Bowse v. Portfolio Recovery Assocs., LLC*, 218 F. Supp. 3d 745 (N.D. Ill. 2016); *Litt v. Portfolio Recovery Assocs. LLC*, 146 F. Supp. 3d 857 (E.D. Mich. 2015).

### III. General District Court Recognizance

Next, Green seeks to challenge the general district court's issuance of a recognizance to her when trial was continued from May 2021 to July 2021. She argues that Code § 8.01-408[18] violates the Fourteenth Amendment and the FDCPA as applied to "the issuance of a [r]ecognizance on behalf of a debt collector."

Green's argument is waived. Her appeal challenges the *general district court's* decision to issue her a recognizance. But Code § 17.1-405 states that "any aggrieved party may appeal to the Court of Appeals from . . . any final judgment, order, or decree of a *circuit court* in a civil matter." Code § 17.1-405(A)(3) (emphasis added). This Court lacks jurisdiction to review a general district court's order.

### CONCLUSION

For all these reasons, we reverse and vacate the circuit court's judgment against Green and remand for the court to enter final judgment that Green does not owe a debt to PRA and to further consider Green's counterclaim against PRA.

*Reversed, vacated, and remanded.*

---

[18] Code § 8.01-408 provides:

> Upon the continuance of any civil case in a court, the court shall at the request of any party litigant require such party's witnesses then present to enter into recognizance in such penalty as the court may deem proper, either with or without security, for their appearance to give evidence in such case on such day as may then be fixed for the trial thereof.

Malveaux, J., concurring in part, and dissenting in part.

I join my colleagues in holding that this Court lacks jurisdiction to review the general district court's decision to issue a recognizance to Green. But I respectfully dissent from the majority's holding "that the assignment of rights alleged here [by PRA] created a standing issue." And I also respectfully dissent from the majority's holding with respect to Green's counterclaim.

A. Standing

In her assignment of error relevant to this issue, Green asserts that the trial court erred "by finding that PRA was entitled to judgment against [her] . . . because PRA lacked standing to sue." In her argument developing this issue, Green contends that PRA lacked standing to sue because it failed to prove that it owned the debt it sought to collect from her. Green thus conflates an evidentiary sufficiency issue comprising part of PRA's case-in-chief with the issue of PRA's standing to bring that case in the first place, an error replicated by the majority in its opinion.[19] But as our Supreme Court makes clear in its recent decision in *Morgan*, "courts must not 'conflate the threshold standing inquiry with the merits of [a litigant's] claim.'" *Morgan v. Bd. of Supervisors of Hanover Cnty.*, ___ Va. ___, ___ (Feb. 2, 2023) (alteration in original) (quoting *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 312 (4th Cir. 2009)).

---

[19] *Compare McClary v. Jenkins*, 299 Va. 216, 221 (2020) ("[S]tanding to maintain an action is a preliminary jurisdictional issue having no relation to the substantive merits of an action." (quoting *Andrews v. Am. Health & Life Ins. Co.*, 236 Va. 221, 226 (1988))), *with Little v. Cooke*, 274 Va. 697, 718 (2007) ("Generally, the appropriate way to test the sufficiency of evidence" during or after a trial on the merits "is by a motion to strike or by a motion to set aside a verdict."), *and Gabbard v. Knight*, 202 Va. 40, 43 (1960) (noting that "a motion to strike is an appropriate way of testing the sufficiency of relevant evidence to sustain an adverse verdict" on the merits and that "a motion to set aside the verdict [i]s an equally appropriate method of testing the sufficiency of the evidence" following a trial on the merits).

In *Morgan*, a number of homeowners challenged their county board of supervisors' approval of rezoning and special use permits authorizing construction of a large commercial facility near their homes. *Id*. at ___. The homeowners brought an action against the board, alleging that it had violated Virginia law and seeking declaratory and injunctive relief. *Id*. at ___. To support their standing to pursue their claims against the board, the homeowners alleged that the approved commercial facility would have a disproportionate effect on them beyond the effect experienced by the larger public and proffered "various likely scenarios of th[eir] particularized harm." *Id*. at ___. The circuit court dismissed the case on demurrers,[20] holding, among other things, that the homeowners' pleadings failed to allege a sufficient factual basis to establish standing. *Id*. at ___, ___. The Supreme Court reversed the circuit court and remanded the matter for further proceedings, after determining that the homeowners in fact had standing to assert all their claims. *Id*. at ___, ___.

In reversing the circuit court, the Supreme Court availed itself of the opportunity to engage in a thorough discussion of the fundamental distinction between standing and decision on the merits, noting that the standing requirement "can be satisfied without the necessity of asserting a plausibly successful claim on the merits" and that "'standing . . . is a preliminary jurisdictional issue having no relation to the substantive merits of an action.'" *Id*. at ___ (quoting *McClary v. Jenkins*, 299 Va. 216, 221 (2020)). This was so because fundamentally, "[t]he concept of standing concerns itself with the characteristics of the person or entity who files suit," rather than their likelihood of ultimate success. *Id*. at ___ (quoting *Anders Larsen Tr. v. Bd. of*

---

[20] The circuit court initially sustained demurrers to all counts of the complaint, holding that the homeowners lacked standing but granting leave to amend several counts. *Morgan*, ___ Va. at ___. The homeowners filed an amended complaint alleging additional details to support their assertion of standing, to which the circuit court also sustained demurrers. *Id*. at ___.

*Supervisors of Fairfax Cnty.*, 301 Va. 116, 120 (2022)).  The Court further observed that "[t]his

distinction, though subtle, plays an important role in the judicial process," because

> [n]early every form of judicial relief (damages, specific
> performance, injunctive remedies, extraordinary writs, etc.)
> requires proof of a specific legal right that was infringed and that is
> capable of being remedied by a court.  If the standing analysis
> simply tracked this decisional sequence on the merits, it could
> create an absurdity: A court would never be able to decide the
> merits of a claim against a claimant because that would mean the
> court never had jurisdiction to address the merits in the first place.

*Id*. at ___.  "Instead," the Court noted, "as 'a preliminary jurisdictional issue,' the standing

doctrine asks only whether the claimant truly has 'a personal stake in the outcome of the

controversy.'"  *Id*. at ___ (quoting *McClary*, 299 Va. at 221-22); *see also McClary*, 299 Va. at

222 (noting the "personal stake" requirement and that "[t]ypically, to establish standing a

plaintiff must allege a particularized injury that is separate from the public at large").[21]

Considering the "personal-stake factors" germane to the specific context before it, the Court

ultimately concluded that "[t]he homeowners' factual allegations in this case, when assumed to

be true," satisfied the injury requirement "for purposes of standing."[22]  *Id*. at ___.

---

[21] Reinforcing the fundamental standing/merits distinction, the Court in *Morgan* further "agree[d] that standing requires particularized harm to 'be fairly traceable'" to a defendant's actions, but noted that "the 'fairly traceable' concept 'does not mean that "the defendant's actions are the very last step in the chain of causation."'  If it did, then the standing analysis *would be no different from a merits analysis* that turned upon causation principles."  *Morgan*, ___ Va. at ___ (emphasis added) (citations omitted) (quoting *Mattaponi Indian Tribe v. Va. Dep't of Env't Quality*, 261 Va. 366, 376 (2001)).

[22] The majority attempts to distinguish *Morgan* as irrelevant to Green's appeal, noting that "whether a plaintiff attempting to collect on a [debt]" where "proof that it owns the debt" is contested "raises a question of standing or a defect in the plaintiff's case-in-chief" has "only [been] considered" by Virginia courts "in the context of real property."  But it is of no consequence that *Morgan* addresses this question in resolving a real property dispute.  As noted above, the Supreme Court in *Morgan* engaged in a broad discussion of the analytical distinction between standing and decision on the merits and it made no representation that its holding about this fundamental distinction is limited to the real property context or lacks general applicability to all civil litigation.  *See Morgan*, ___ Va. at ___; *see also id*. at ___ (noting that "[i]n zoning

- 27 -

I conclude that *Morgan* is controlling on the issue raised by Green's assignment of error and developed in her argument on brief. Whether PRA owned Green's debt was a matter for the circuit court to consider on the merits and did not create a standing issue, because proof of PRA's ownership of the debt went to the ultimate success or failure of PRA's claim and not PRA's "characteristics" as a creditor facing harm if a debt to it were not repaid. *Id*. at ___ (quoting *Anders Larsen Tr.*, 301 Va. at 120); *see also Howell v. McAuliffe*, 292 Va. 320, 330 (2016) ("Standing concerns itself with the characteristics of the individuals who file suit and their interest in the subject matter of the case."). As noted by the Court in *Morgan*, to have required PRA to prove ownership of the debt in order to establish standing could potentially have led to an absurd result, because "[i]f the standing analysis simply tracked th[e] decisional sequence on the merits," the circuit court "would never [have] be[en] able to decide the merits of [PRA's] claim against [it] because that would mean the court never had jurisdiction to address the merits in the first place." *Morgan*, ___ Va. at ___. Thus, to establish standing, PRA needed only to plead sufficient facts that, "*when assumed to be true*," would satisfy standing's "personal stake" or particularized harm requirement. *Id*. at ___ (emphasis added); *see also Howell*, 292 Va. at 330 ("[S]tanding can be established if a party *alleges* he or she has a 'legal interest' that has been harmed by another's actions." (emphasis added) (citation omitted)). Accordingly, I respectfully dissent from the majority's holding "that the assignment of rights alleged here [by PRA] created a standing issue."

Further, I do not reach the merits of the issue whether PRA proved it owned Green's debt and the circuit court erred in ruling in favor of PRA. As noted above, Green's assignment of error asserts that the circuit court erred "by finding that PRA was entitled to judgment against

cases, *no less than all others*, allegations of standing" require assertions of injury (emphasis added)).

- 28 -

[her] . . . because PRA lacked standing to sue." Green's assignment of error is thus limited solely to the issue of standing; it does not encompass the question of whether PRA's evidence at trial was sufficient to prove its ownership of Green's debt and thus to support the circuit court's judgment in favor of PRA. Although I am not unsympathetic to Green's circumstances, and her status as a *pro se* litigant in the circuit court and before this Court, I conclude that the limits of Green's assignment of error do not allow us to address any issue beyond standing. It is well established in Virginia, and recently has been reiterated by our Supreme Court, that "[t]he purpose of assignments of error is to point out the errors with reasonable certainty in order to direct [the] court and opposing counsel to the points on which appellant intends to ask a reversal of the judgment, and to limit discussion to these points."[23] *Moison v. Commonwealth*, ___ Va. ___, ___ (Oct. 19, 2023) (alterations in original) (quoting *Yeatts v. Murray*, 249 Va. 285, 290 (1995)). "In this way, '[a] properly aimed assignment of error must "point out" the targeted error and not simply take "a shot into the flock" of issues that cluster around the litigation.'" *Stoltz v. Commonwealth*, 297 Va. 529, 534 (2019) (alteration in original) (quoting *Forest Lakes Cmty Ass'n v. United Land Corp. of Am.*, 293 Va. 113, 122 (2017)). An assignment of error thus "cabins the error that th[e] Court can consider." *Moison*, ___ Va. at ___; *see also* Rule 5A:20(e) (requiring an appellant's assignments of error to clearly frame the issues raised before the Court). And Virginia case law makes clear that a party "who represents h[er]self is no less bound by the rules of procedure and substantive law than a [party] represented by counsel." *Hammer v. Commonwealth*, 74 Va. App. 225, 236 (2022) (quoting *Townes v. Commonwealth*, 234 Va. 307, 319 (1987)); *see also Townes*, 234 Va. at 319 ("[T]he 'right of self-representation is not a license' to fail 'to comply with the relevant rules of procedural and substantive law.'" (quoting

---

[23] And even more recently, our Supreme Court made clear its disapproval of this Court addressing issues that were neither briefed nor argued by the parties. *See Commonwealth v. Puckett*, ___ Va. ___, ___ (Nov. 22, 2023).

- 29 -

*Faretta v. California*, 422 U.S. 806, 834 n.46 (1975))).  Accordingly, I do not reach the merits of whether or not PRA proved it owned Green's debt and the circuit court erred by ruling for PRA.[24]

## B.  Green's Counterclaim

Green assigns error to the circuit court for "finding that [her] FDCPA counterclaim failed because her counterclaim was never heard[,] violating due process."[25]  Here, the circuit court's final order of January 3, 2022, clearly indicates that Green's counterclaim was heard: "Green was present at this Circuit Court appeal and represented herself. . . .  Whereupon the Court heard the evidence presented on behalf of both parties and the argument of counsel . . . and . . . finds and determines that [Green]'s counterclaim fails and she is not entitled to judgment on same."  It is well-established that a "circuit court speaks through its orders," *Roe v. Commonwealth*, 271 Va. 453, 458 (2006), and that "such orders are presumed to reflect accurately what transpired," *Temple v. Mary Wash. Hosp., Inc.*, 288 Va. 134, 141 (2014).  Accordingly, because the circuit court heard Green's counterclaim against PRA, I would reject Green's due process argument and affirm the circuit court's judgment on the counterclaim.[26]

---

[24] Because I do not reach the merits of whether the circuit court erred by entering judgment on the debt in favor of PRA, I also do not reach the merits of Green's third assignment of error, which alleges that the circuit court erred by paying her cash bond to PRA.

[25] On brief, Green explicitly invokes only her due process rights under the Fourteenth Amendment to the Constitution of the United States.  Her argument, however, appears also to implicate her due process rights under Article I, Section 11 of the Constitution of Virginia.

[26] *See* my discussion, supra, of the controlling Virginia case law on the role of assignments of error in shaping and limiting an appellate court's analyses.